INDUSTRIES, INVESTMENTS & AGENCIES (BAHAMAS) LTD., a Bahamian Corporation, Plaintiff-Appellant Cross Appellee,

v.

PANELFAB INTERNATIONAL CORPORATION, a Florida Corporation, Defendant-Third Party Plaintiff Appellee-Cross Appellant,

v.

Manfred LEHMANN, Third Party Defendant-Appellee.

No. 74–3747
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

April 8, 1976.
Rehearing Denied June 17, 1976.

---

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5 Cir., 1970, 431 F.2d 409, Part I.

Michael J. Cappucio, Herbert L. Nadeau, Faunce, Fink & Forman, Miami, Fla., for Industries, Investments, etc., & M. Lehmann.

Pettigrew & Bailey, Eugene E. Stearns, Miami, Fla., for Panelfab Intern. Corp.

Before BROWN, Chief Judge, CLARK and GEE, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Plaintiff Industries, Investments & Agencies (Bahamas) Ltd. (IIA) brought this diversity action on a contract of agency seeking unpaid commissions from defendant Panelfab International Corporation (Panelfab), a Florida corporation. Panelfab counterclaimed to recover commissions it had already paid to IIA. A jury returned a special verdict consisting of answers to written interrogatories, F.R.Civ.P. 49(a), followed by what appears to be a general verdict[1] finding for defendant Panelfab in the main action and for counterdefendant IIA on the counterclaim. Plaintiff IIA and counterplaintiff Panelfab both appeal. We affirm.

### The Agency Arrangement

The pre-trial stipulation of facts provides an overview of the series of agreements and transactions which gave rise to this dispute. Panelfab builds and markets pre-manufactured housing, schools, hospitals and the like. In February 1971 Bernard Moskovits visited the officers of Panelfab in Miami on behalf of IIA, a Bahamian corporation, to discuss the possibility of IIA soliciting contracts for educational and health facilities for Panelfab in the Bahamas, where conventional building methods are costly and often unavailable. An agreement was reached, as expressed in a letter of March 9, 1971, which gave IIA authority for a period of six months to negotiate sales transactions for Panelfab in the Bahamas for educational facilities, and which provided that Panelfab would reserve for IIA a commission of 11½% of the net sales price, payable upon receipt of payment from the customer.

During the ensuing months, Panelfab officials with the assistance of Moskovits conducted negotiations with the Bahamian government for a major school construction project, and Panelfab obtained a preliminary commitment from the Export-Import Bank of the United States (Eximbank) for a loan in excess of $8 million to finance the project. On October 27, 1971 Panelfab and IIA entered into a second letter agreement, which

---

1. The record is not clear why this structure was used. As later discussed, we point out that mixing special interrogatories with a general verdict under F.R.Civ.P. 49(b) is tricky business. *See* note 4, *infra*.

amended the manner of payment of commissions. It provided that 35% of the commission would be paid by Panelfab upon receipt of a down payment from the Bahamian government, after which the remainder of the commission would be paid at various intervals of the transaction. On November 12, 1971 Panelfab extended the March 9, 1971 agreement for 6 months until May 12, 1972.

Panelfab and IIA negotiated another letter agreement on January 3, 1972 to allow IIA to earn commissions on future school construction contracts.[2] This agreement authorized IIA to solicit contracts for school buildings until December 31, 1973, on the conditions that (i) the initial school contract be concluded by March 9, 1972 and that (ii) Panelfab continue to maintain a resident agent in Nassau who would participate in the negotiation of the initial school contract and would facilitate its performance and completion.

On February 7, 1972 Panelfab and the Bahamian government signed an $11 million contract for the initial school project, contingent upon final approval of financing by Eximbank, and in early May, 1972 the Bahamian government sent Panelfab a downpayment of $1,266,123.00. As previously agreed, Panelfab then paid IIA $458,850.00 on May 10,

1972, the first installment on its commission. Relying on instructions from Moskovits and Zolten Weinmann, at that time president of IIA, Panelfab gave two checks to Moskovits, one payable to IIA for $220,248.00 and the other payable to Gemini Financial Corporation (Gemini) for $238,602.00.

In June, 1972, however, Eximbank declined to finance the project. About the same time a dispute developed between Moskovits and Manfred Lehmann of IIA over who actually controlled IIA, and Lehmann accused Moskovits of embezzling the commission moneys paid to Gemini. In August, 1972 Lehmann hired S. A. Morris, who was soon thereafter appointed to the Bahamian Senate, to replace Moskovits as IIA's resident agent for the school project.

Panelfab and the Bahamian government made another application to Eximbank for financing, and on May 3, 1973 Eximbank approved the project and loan agreements were signed.

### A Bahamian Brouhaha

In its complaint, IIA alleged that in spite of the Bahamian government's downpayment, Panelfab paid it only $220,248.00 of the total initial installment due. The complaint asserted that this constituted a breach of the agency contract by anticipatory repudiation and

---

**2.** The January 3, 1972 agreement, which plays a central role in the dispute, reads in its entirety as follows:

Gentlemen:

This letter will confirm our various conversations, including that of January 3, 1972.

In the event that a contract between Panelfab International Corporation, or its subsidiary, and the Government of the Bahamas is satisfactorily concluded in all ways by March 9, 1972, and subject to the continuing of a Resident Agent in Nassau, Bahamas of Industries Investment Agencies (Bahamas) Ltd. through December 31, 1973, and providing that this Resident Agent shall actively assist and participate in the discussions and/or negotiations with a continuing contract with the Government of the Bahamas covering school construction, and, further, presuming that during the period to be ended December 31, 1973, Panelfab International Corporation, or its subsidiary, receives additional contracts for school

buildings, and, further, that such Resident Agent shall, in fact, actively assist Panelfab International Corporation, and/or its subsidiary, or general and subcontractors, to facilitate the smooth performance and conclusion of the initial contract as may be required, then, in the event of all of the above, Panelfab International Corporation agrees that it will compensate Industries Investment Agencies (Bahamas) Ltd. in the same manner as outlined in our letter of March 9, 1971.

The above referenced compensation shall refer to all contracts of the variety outlined above as may be satisfactorily concluded prior to December 31, 1973.

It is understood and agreed that all of the above elements must be, of necessity, included or extension re compensation, etc., shall not be binding upon the parties.

Sincerely yours,

PANELFAB INTERNATIONAL CORPORATION

entitled IIA to its full commission of 11½% of the net sales price minus the $220,248.00 already paid, equaling $1,092,528.90. IIA's position was based on its view that in paying part of the first installment to Gemini, Panelfab disregarded instructions in a letter of December 20, 1971 from Weinmann, its then president, to pay all commissions to a Canadian bank in Nassau. IIA further prayed for a declaration that its agency contract with Panelfab continued to be valid and binding.

Panelfab answered that it received subsequent instructions from Weinmann and Moskovits in letters of May 8 and 9, 1972 to pay 48% of the commission then due to IIA and 52% to Gemini, and that it made the full initial commission payment in good faith pursuant to these instructions.

Panelfab also answered that the contract of agency with IIA was unenforceable and void, thus freeing it from making any further commission payments to IIA. Panelfab asserted that the various letter agreements were only partial expressions of a single agency agreement, which was composed of numerous written and oral agreements between IIA and Panelfab. Panelfab contended that the oral consideration for the October 27, 1971 agreement was the maintenance in the Bahamas of a full-time resident agent by IIA and that the January 3, 1972 letter agreement—with its written expression of the resident agent requirement—was intended by the parties to be a condition precedent to the payment of commissions for the initial school contract as well as all future school contracts. Panelfab claimed that from May, 1972, when the dispute arose between Moskovits and Lehmann, IIA failed to

maintain a resident agent in the Bahamas and did not help facilitate the performance of the school contract, thus breaking its agency contract.[3]

In addition to asserting IIA's breach, Panelfab answered alternatively and cumulatively that the agency contract was no longer valid because of IIA's impossibility of performance and because the contract was illegal and contrary to public policy. The claim of impossibility was based on alleged quarrelling between Moskovits and Lehmann, conflicting instructions from them to Panelfab, IIA's simultaneous representation of Panelfab's competitors, and derogatory statements made by Lehmann in the Bahamas about Panelfab. The basis of Panelfab's claim of illegality was that unknown to Panelfab (i) Lehmann was an official of the Bahamian government—his corporation, Intergovernmental Philatelic Corporation, was the philatelic agent for the Bahamas—and through IIA Lehmann was selling his official influence, and (ii) the employment of Bahamian Senator Morris as IIA's resident agent was also an illegal attempt to exploit the Senator's influence and political position.

Finally, on the basis of the same theory of illegality, Panelfab counterclaimed, seeking recision of the contract and recovery of the initial installment of $458,850.00 it had paid on IIA's commission.

### The Jury Speaks

■ Because of the complexity of the case and the numerous theories of recovery relied on by both parties, the District Court wisely submitted written interrogatories to the jury to accompany its general verdict. F.R.Civ.P. 49(b).[4]

---

**3.** Panelfab also asserted that the contract of the agency was void because the initial school contract, though signed on February 7, 1972, was not completed by March 9, 1972, as required in the January 3, 1972 agreement (or even by May 12, 1972—as provided in the November 12, 1971 agreement—should the January 3, 1972 agreement be found not to apply). The school contract was contingent on financing being approved by Eximbank, which did not occur until May 3, 1973. The jury, in

answer to Interrogatory No. 5, found that although the school contract was not "satisfactorily concluded in all ways by March 9, 1972," Panelfab waived its right to enforce this condition. *See* note 5, *infra*.

**4.** The District Court's decision to use written interrogatories followed temporally by a general verdict pursuant to F.R.Civ.P. 49(b), rather than the safer and generally superior technique of submitting only written questions

The jury found that Panelfab's payment to Gemini was a proper payment under the agreement.[5] Int. No. 8. The jury further found that the January 3,

upon each issue of fact to the jury without having it return a general verdict, F.R.Civ.P. 49(a), proved harmless in this case, since the general verdict was not inconsistent with the answers to the written interrogatories. *But see Wolfe v. Virusky*, 5 Cir., 1972, 470 F.2d 831, 837 (Brown, C. J., concurring); *Swann v. Huttig Sash & Door Co.*, 5 Cir., 1970, 436 F.2d 60; *Hatfield v. Seaboard Air Line R. Co.*, 5 Cir., 1968, 396 F.2d 721, 724; *Weymouth v. Colorado Interstate Gas Co.*, 5 Cir., 1966, 367 F.2d 84, 93 n. 31; Brown, Federal Special Verdicts: The Doubt Eliminator, 1967, 44 F.R.D. 338. Cf. *Jamison Co., Inc. v. Westvaco Corp.*, 5 Cir., 1976, 526 F.2d 922, pp. 934–936 [1976].

5. The jury answered the following written interrogatories:

1. Was the intent of the parties at the time the January 3 agreement was signed to have it apply to all *school buildings* contracts executed between Panelfab and the Government of the Bahamas, past and future?

___X___ Yes _____ No

2. If your answer to number 1 above is yes, answer the following inquiry.

Was Panelfab fraudulently induced by the plaintiff to sign the January 3, 1972 agreement?

_____ Yes ___X___ No

3.(a) Was IIA under a duty to maintain a full-time resident agent in the Bahamas until the conclusion of the school construction contract in order to recover any commissions?

___X___ Yes _____ No

(b) If your answer to 3(a) above is yes, answer the following inquiry:

Did IIA satisfy its obligations in this respect?

_____ Yes ___X___ No

4. If your answer to number 1 above is yes, answer the following inquiries.

a. Was IIA under a duty to assist Panelfab in the smooth implementation of the school construction contract in order to recover any commissions?

___X___ Yes _____ No

b. If your answer to 4(a) above is yes, answer the
following inquiry.

Did IIA satisfy its obligations in this respect?

_____ Yes \_\_\_X\_\_\_ No

5. If your answer to number 1 above is yes, answer the
following inquiries.

a. Was the contract between Panelfab and the Government
of the Bahamas "satisfactorily concluded in all
ways by March 9, 1972"?

_____ Yes \_\_\_X\_\_\_ No

b. If your answer to number 5(a) above is no, answer
the following inquiry.

Did Panelfab waive its right to enforce the
condition that the contract between Panelfab and
the Government of the Bahamas be "satisfactorily
concluded in all ways by March 9, 1972"?

\_\_\_X\_\_\_ Yes _____ No

6. Was the performance or contemplated performance of
the contract by the plaintiff IIA illegal and/or contrary to public
policy?

_____ Yes \_\_\_X\_\_\_ No

7. If your answer to number 6 above is yes, answer the
following inquiry.

Did Panelfab participate in the activities which were
illegal and/or contrary to public policy?

_____ Yes _____ No

8. Was the payment made by Panelfab to Gemini Financial
Corporation on May 10, 1972 a proper payment under the contract
for which the defendant is entitled to credit?

\_\_\_X\_\_\_ Yes _____ No

**1210**

1972 agreement did apply to the initial school project, that IIA was under a duty to maintain a resident agent in the Bahamas and to assist Panelfab in the smooth implementation of the school contract in order to recover any commissions, and that IIA breached its contract in both respects. Ints. Nos. 1, 3 & 4. Cumulatively, the jury found that continued performance by IIA as originally contemplated by the parties was impossible. Int. No. 9. However, the jury was not persuaded that the performance of the agency contract by IIA was illegal or contrary to public policy, Int. No. 6, thus finding against Panelfab's counterclaim for recision. After answering the written interrogatories, the jury returned what looks like a general verdict[6] for Panelfab as defendant and formally in favor of Panelfab as counterplaintiff but assessed Panelfab's damages on the counterclaim as none.

9. Is continued performance under the contracts by IIA impossible as that performance was contemplated by the parties at the time the contracts were entered into?

 X **Yes** **No**

6. The document, signed by the Foreman of the jury, reads as follows:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NO. 73-1008-Civ-CA

INDUSTRIES, INVESTMENTS & AGENCIES (BAHAMAS) LTD.,

 Plaintiff VERDICT

v

PANELFAB INTERNATIONAL CORPORATION,

 Defendant Miami, Florida

v April __9__, 1974

MANFRED LEHMANN

 Third Party Defendant

WE, THE JURY, find for the defendant and counterplaintiff Panelfab International Corporation and assess its damages at $ _NONE_ .

 SO SAY WE ALL.

/S/
 FOREMAN

### IIA's Attack

Appellant IIA raises several issues on appeal. It contends that (i) the District Court erred in admitting parole evidence on the intent of the parties in entering into the written letter agreements, (ii) the evidence was not sufficient to sustain the jury's finding that IIA was under a duty to maintain a resident agent in the Bahamas or to sustain the jury's finding that IIA had not satisfied any resident agent requirement, (iii) the District Court erred in not asking the jury in writing whether Panelfab had waived the resident agent requirement or contributed to the impossibility of IIA performing the contract, (iv) the District Court should have granted a short continuance to allow Lehmann to offer rebuttal testimony after Passover or to admit his deposition, and (v) the District Court erred in not allowing IIA to inquire as to the availability of Moskovits as a witness and in refusing to instruct the jury that it could draw an inference adverse to Panelfab from Panelfab's failure to call Moskovits as a witness.

### Panelfab's Attack

Cross-appellant Panelfab argues that the District Court erred in not directing a verdict that the contract was illegal or against public policy and in denying its proposed jury instructions on illegal use of a public office.

### Parole Evidence

IIA contends that parole evidence was improper because the written agreements of March 9, October 27 and November 12, 1971 are unambiguous and constitute a complete contract on their face. It likewise contends that the January 3, 1972 agreement is unambiguous and on its face clearly does not apply to the agency agreement on the initial school project.

■■ Under Florida law, parole evidence is admissible to prove the elements of an agreement where a writing is ambiguous on its face or fails to contain the elements of a complete contract. *Everglade Lumber Co. v. Nettleton Lumber Co.*, 1933, 111 Fla. 333, 149 So. 736. Parole evidence is also admissible to show the consideration for an agreement where none appears therein, *Diesel Heat and Power, Inc. v. Dixon*, 5 Cir. (Fla.), 1956, 232 F.2d 217; *Asphalt Paving, Inc. v. Ulery*, Fla.App., 1963, 149 So.2d 370, or to connect several writings and to show that they are part of the same transaction. *Northwestern Bank v. Cortner*, Fla.App., 1973, 275 So.2d 317; *Asphalt Paving, Inc. v. Ulery*, Fla.App., 1963, *supra.* Whether a contract is or is not ambiguous is a question of law to be determined by the trial court. *Pipkin v. FMC Corp.*, 5 Cir. (Fla.), 1970, 427 F.2d 353; *East Coast Electronics, Inc. v. Walter E. Heller & Co.*, 5 Cir. (Fla.), 1966, 355 F.2d 923. Once the trial court determines that a contract is ambiguous, the proper construction of the contract is a question of fact within the province of the jury. *Vineberg v. Brunswick, Corp.*, 5 Cir. (Fla.), 1968, 391 F.2d 184; *Hollywood v. Zinkil*, Fla.App., 1973, 283 So.2d 581.

■ Each of the writings in question states that it is a confirmation of one or more prior conversations. The October 27, 1971 agreement does not contain any consideration for Panelfab's agreement to make commission payments earlier than previously agreed. The March 9, October 27 and November 12, 1971 writings all pertain to a single contract of agency. We therefore agree with the District Court that the agency agreement was sufficiently ambiguous to warrant the admission of parole evidence to determine the intent and understanding of the parties to the agreement when it was formed and from time to time modified. *See Morris v. Federated Mutual Ins. Co.*, 5 Cir. (Fla.), 1974, 497 F.2d 538.

### Sufficiency Of The Evidence

■ IIA argues that even considering all the evidence—written and parole— the District Court should have granted IIA's motions for a directed verdict, and for judgment notwithstanding the verdict, and for a new trial with respect to the jury's findings that IIA was under a

duty to maintain a resident agent, Int. No. 3(a), and that IIA had not satisfied that obligation. Int. No. 3(b). We conclude from our review of the extensive Appendix that there was substantial evidence to warrant the District Court's submission of both of these issues to the jury. *See Boeing Co. v. Shipman*, 5 Cir., 1969, 411 F.2d 365.

Without presenting all of the conflicting evidence adduced at trial, we briefly point out that there was sufficient evidence, including the testimony of Milton Fisher, Panelfab's president, for the jury to conclude that Eximbank financing of the initial school project depended in part upon Panelfab and IIA maintaining a resident agent in the Bahamas, IIA's oral agreement to meet the resident agent requirement was the consideration for Panelfab's October 27, 1971 written agreement to advance commission payments, the January 3, 1972 agreement was meant to apply to the initial school project as well as to future contracts obtained by IIA, and the resident agent and "facilitation of performance" provisions in the January 3, 1972 agreement were the written expression of this previous oral agreement. In addition, the evidence is sufficient to support jury findings that as of May, 1972, when the feud between Moskovits (who had been acting as resident agent) and Lehmann of IIA broke out, IIA failed to maintain a resident agent in the Bahamas, forcing Panelfab to hire Moskovits itself as the resident agent, and IIA failed to facilitate the smooth performance of the contract during the crucial months following Eximbank's rejection of the application for financing.

### Failure to Include Interrogatories

■ IIA also contends that the District Court erred in denying its request to include written interrogatories, as parts of Interrogatories Nos. 3 and 9, to ask the jury whether by its conduct Panelfab waived the resident agent requirement and contributed to the impossibility of further performance of the agency agreement. IIA had presented

evidence which tended to show that Panelfab was responsible for any inability on the part of IIA to fulfill the resident agent requirement or to carry out the agency agreement by intentionally encouraging the rift which developed between Moskovits and Lehmann, secretly hiring resident agent Moskovits away from IIA, and thereafter refusing the assistance of Lehmann and Bahamian Senator Morris of IIA.

It may have been preferable for the District Court to allow the jury specifically to address this issue by including appropriate specific interrogatories (as it had regarding Panelfab's claim of fraud in Interrogatory No. 5). But following the concept of a Rule 49(a) submission (*see* note 4, *supra*) in which the general charge plays a critical role in translating factual issues into definitive action by the jury, the District Court instead included IIA's theories of waiver and contribution in its instructions to the jury. In explaining the resident agent issue, the District Court instructed the jury:

> If you should find that such a duty existed then you should determine whether the plaintiff failed to so perform and *whether such failure was caused by the conduct of plaintiff or its agents.* App. at 105 (emphasis added).

The Court continued:

> I further charge you that if you find that Panelfab contributed to the disruption of the relationship between Panelfab and Bernard Moskovits and it created the conditions about which it now complains, then you are instructed that a party who prevents the other from performing under a contract cannot urge such non-performance as a defense to action under the contract. In other words, one who prevents or makes impossible performance cannot use non-performance as an excuse to breach the contract. App. at 107.

In a related context, the Court gave the general instruction:

> I instruct you as a matter of law that a party may be deemed to have

waived a contractual right by its conduct. Waiver may be inferred from conduct or acts putting another off his guard and leading another to believe that a right has been waived. App. at 96.

In our view, these instructions were sufficient to inform the jury that if Panelfab interfered with IIA's maintenance of a resident agent or contributed to the impossibility of continued performance of the agreement by IIA, then IIA would not have failed to satisfy the resident agent requirement, Int. No. 3(b), and the doctrine of impossibility would not apply. Int. No. 9. The jury's answers were a capsulated response to the Court's instructions.

### Denial Of Continuance

IIA next contends that the District Court abused its discretion in not granting a continuance on the final day of trial, which fell on Passover, to allow Lehmann, whose Jewish faith prohibited him from appearing in court that day, to rebut damaging testimony given by Panelfab's president, Milton Fisher, and in refusing alternatively to admit portions of Lehmann's deposition. The basis of the District Court's ruling, however, was that the proffered testimony was cumulative and thus not proper in rebuttal. *Driscoll v. Morris*, Fla.App., 1959, 114 So.2d 314. The denial of the requested continuance was based solely on this evidentiary ruling and in no way concerned the religious holidays. The District Court acted well within its discretion in finding the proffered testimony cumulative and thus inadmissible in rebuttal.

### Failure To Call Moskovits

IIA's final contention is that the District Court erred in not instructing the jury that because Panelfab failed to call Moskovits as a witness, the jury could infer that Moskovits' testimony would have been unfavorable to Panelfab. IIA also asserts that the District Court's ruling precluded it from asking Panelfab about Moskovits' availability

and about the efforts made by Panelfab to produce him. The District Court ruled, after a short conference with counsel, that Panelfab was under no duty to produce Moskovits. Panelfab argued that Moskovits, a resident of the Bahamas, feared he would be criminally prosecuted by IIA for embezzlement should he come to the United States to testify. IIA was understandably reluctant to stipulate that no criminal process would be sought against Moskovits. Under the circumstances, and after a sufficient airing of the issue, we feel that the District Court took an acceptable course in refusing IIA's requested instruction but in allowing the parties to argue to the jury what inference should be drawn from Moskovits' absence. *Cf. Labit v. Santa Fe Marine, Inc.*, 5 Cir., 1976, 526 F.2d 961.

### Panelfab's Claim of Illegality

Panelfab's cross-appeal from the denial of its counterclaim for recision and return of commission, which was premised on the illegality of the agency contract, turns on the propriety of the District Court's determination that Manfred Lehmann of IIA was not an "official" of the Bahamian government. A contract by which a government official agrees to use his official position or information confidentially obtained therefrom to influence public officials and otherwise help another obtain government contracts is illegal and contrary to public policy, and such a contract will not be enforced by courts in this country. *Oscanyan v. Arms Co.*, 1880, 103 U.S. 261, 26 L.Ed. 539; 6A Corbin on Contracts §§ 1449–50. On the other hand, it *is* lawful for a person who is *not* a public servant, government employee, or political officeholder to contract to use his influence or personal connections merely to gain access to a public official or even to urge an official to favor his client's proposal, as long as the persuasion is made on the merits of the proposal and not on any other basis. *Troutman v. Southern Railway Co.*, 5 Cir., 1971, 441 F.2d 586; *Robert & Co. v.*

*Mortland,* 1948, 160 Fla. 125, 33 So.2d 732.

The District Court found, as a matter of law, that Lehmann's position as philatelic agent of the Bahamian government was not an official position within the meaning of *Oscanyan,* and accordingly instructed the jury in the less stringent standard of illegality as expressed in *Troutman.*

 We believe the District Court decided correctly. There was no dispute as to Lehmann's connection with the Bahamian government. He was the head of the Intergovernmental Philatelic Corporation (IPC) which held contracts with numerous developing countries, including the Bahamas, to market their postage stamps. The contract with the Bahamian government provided that IPC was to be paid a commission of 25% of all stamp sales, that IPC was to bear all its own expenses, including bonding and insurance, and that disputes arising out of the contract would be settled through arbitration. There was uncontroverted evidence that in the stamp business one who is a government's "philatelic agent" is nothing more than a private businessman, not a public servant. Moreover, the information concerning the Bahamas' interest in school construction projects which initially prompted Lehmann to establish IIA came from a reading of the Bahamian national budget, a public record. On the basis of its interpretation of the IPC's philatelic contract and these undisputed facts, the District Court rightly determined that Lehmann was not sufficiently charged with the public trust to warrant being considered a public official of the Bahamian government. Senator Morris, hired by IIA in August, 1972 and appointed to the Bahamian Senate in October, 1972, was not sufficiently linked by the evidence to IIA's contract with Panelfab, either in time or in actual services rendered, to warrant a contrary conclusion. The District Court therefore correctly gave the *Troutman* instruction on illegality to the jury rather than Panelfab's suggested instruction based on *Oscanyan,* and Pa-

nelfab's motion for summary judgment, directed verdict and judgment notwithstanding the verdict were properly denied.

AFFIRMED.