TALEN'S LANDING, INC.,
Plaintiff-Appellee,

v.

M/V VENTURE, II, Etc., et al., Defendants,

Venture Towing, Inc., Venture Marine Enterprises, Inc. and Jacques J. Creppel, Defendants-Appellants.

No. 80–3842
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

Sept. 25, 1981.

Warren G. Reeks, River Ridge, La., for defendants-appellants.

Phelps, Dunbar, Marks, Claverie & Sims, George J. Fowler, III, New Orleans, La., for plaintiff-appellee.

Before BROWN, POLITZ and TATE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

### I.

Appellee, Talen's Landing, Inc. (Talen's), a Louisiana corporation, operates a boat store and marine fueling service at Mile 193 of the Intercoastal Canal. Appellant, Jacques J. Creppel, a Louisiana domiciliary, is president, manager and principal shareholder (50%) of the corporations, Venture Marine Enterprises, Inc. and Venture Towing,

Inc. Creppel's wife is the owner of the other 50% of the shares of stock of the corporations, but she does not take an active role in the businesses.

In December 1978 and January and February 1979, Talen's provided fuel and other services to the vessel M/V VENTURE III in the total amount of $9,250.27 which was not paid. It is undisputed that the registered owner of the M/V VENTURE III is Venture Marine Enterprises, Inc. Subsequent to the above-mentioned sales, Talen's as customary with prior sales to Mr. Creppel forwarded its invoices to Venture Towing, Inc. for fuel supplied to M/V VENTURE III.

On March 30, 1979 Talen's made a demand upon Venture Towing, Inc. for payment of the sums owed to Talen's for the fuel and other services provided to the M/V VENTURE III. Receiving no payment, Talen's sued to recover the sums due it. Venture Towing, Inc. in answer to the complaint denied responsibility for the fuel supplied to M/V VENTURE III claiming that another corporation, Venture Marine Enterprises, Inc., was the owner. Subsequently, Talen's amended its complaint to include Venture Marine Enterprises, Inc. and later to include Jacques Creppel as named defendants. After this amendment Talen's learned that Venture Marine Enterprises, Inc. was insolvent because its only asset, the M/V VENTURE III, had previously sunk.

At trial, Talen's introduced into evidence the invoices and meter tickets reflecting the sales of fuel and supplies to the M/V VENTURE III. The Court found that both documents were signed by a crew member of the vessel upon receipt of the fuel or supplies and that together they constituted a contract between the parties. Accordingly, the Court entered judgment against Venture Towing, Inc., Venture Marine Enterprises, Inc. and Jacques J. Creppel, jointly and severally for fuel and supplies, interest and attorney fees.[1]

---

1. The judgment was for the fuel and supplies in the amount of $9,250.27 plus 8% interest from the due dates of the invoices and for 25% attorney's fees on the principal amount and interest. Interest amounted to $335.50 from the respective due dates of said invoices until the date of payment. This latter judgment for $335.50 has not been appealed.

Appellants, Venture Towing, Inc., Venture Marine Enterprises, Inc. and Creppel appeal this judgment alleging that the Court incorrectly (i) allowed extrinsic evidence to modify a sales contract and, (ii) pierced the corporate veil to find Creppel and Venture Towing, Inc. liable for the debts of M/V VENTURE III. Because our review of the record has revealed no clear error in the District Court's finding of fact on these issues, we affirm.

## II.

The core of the argument on the first issue is that the meter tickets alone, and not the invoices or both, constituted the contract with Talen's. The advantage of this argument is obvious. Since the meter tickets were based on tenths of a gallon liability would be limited to only one-tenth of the fuel billed on the invoices. Hence, the Court erred in finding a contract by construing two ambiguous documents together and by further allowing parol evidence consisting of the invoices and testimony of witnesses.

For years and years parol evidence has always been allowed, even in admiralty cases, see, The Pelotas, 66 F.2d 75, 78 (5th Cir. 1933), to explain ambiguous terms of a contract.[2] Here, the Court allowed testimony to explain that the meter tickets were meant for use on machines calibrated to measure tenths of gallons and that no me-

ter tickets which would record the purchase in full gallons were available for use in Talen's fuel pumps which measured and pumped only full gallons. Mr. Talen further explained that he had for over ten years provided meter tickets solely for the convenience of his customers to assure them that the meters had been set at zero before the fuel was pumped.

Mr. Creppel himself testified at trial that he was not contending that all that was delivered was one-tenth of that reflected on the invoices:

> Court: So you think that all that was delivered was one-tenth of what is claimed?
>
> Witness: No, I am not saying all that was delivered was one-tenth. All that I am saying [sic] there is a discrepancy in his meter ticket and the invoice.

Further, when confronted with meter tickets and invoices, Creppel admitted the invoices and tickets (except for one transaction of January 11, 1979) were correct. Creppel contested the correctness of the latter transaction based on the fact that the M/V VENTURE III had taken on fuel on January 5, 1979, and therefore, would not be in need of fuel again as soon as on the 11th.[3]

On this point, the Court found that Creppel's contention did not hold water because there was no evidence that the M/V VENTURE III had filled to capacity on January 5.[4]

2. It is firmly an established principle that parol evidence may be introduced to explain an ambiguity in the terms of a contract. *Interstate Fire Insurance Co. v. Harmon*, 580 F.2d 184, 187 (5th Cir. 1978) (applying Alabama law); *Chadwick v. Esperanza Trade & Transport, Ltd.*, 548 F.2d 1161, 1162 (5th Cir. 1977) (applying Texas law); *Industries, Investments & Agencies (Bahamas) Ltd. v. Panelfab International Corp.*, 529 F.2d 1203, 1211 (5th Cir. 1976) (applying Florida law); *Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040, 1048 (5th Cir. 1971) (applying New York law); *Moreau v. Otis Elevator Co.*, 531 F.2d 311, 313 (5th Cir. 1976) (applying Louisiana law); *Washington Aluminum Co. v. Pittman Construction Co.*, 383 F.2d 798, 801 (5th Cir. 1967) (applying Louisiana law).

3. The record demonstrated that the capacity of the fuel tank on the M/V VENTURE III was between 9,000 and 10,000 gallons and the vessel could use up to 700 gallons per day. Crep-

pel argued that the vessel could have used only 3,500 gallons maximum in the five days between January 5 and January 11, 1979.

4. The invoice and meter ticket for that date, January 5, showed 1,878 gallons purchased and the vessel's log for that date indicated no specific amount; only that fuel was purchased at "193 Boat Store", another designation for Talen's Landing. Furthermore, the log entries on January 11, 1979, read "193 Boat Store topped off water and fuel 7,656 gallons." Despite the fact that the contested invoice and meter ticket for this date showed that exactly 7,656 gallons of diesel fuel were sold to the M/V VENTURE III, Creppel suggested, based on the foregoing log entry, that perhaps the 7,656 gallons could relate to water and not fuel. However, during examination by the Court, Creppel finally relented that the recorded gallons probably did not relate to water.

> THE COURT:

After considering all of the tangible evidence, tickets, invoices, logs, and the live testimony of Creppel, Talen and his employees, the Court found that the tickets and invoices together constituted a contract between the parties because they were accepted and signed by employees of Venture Marine[5] simultaneously. Finding no error factually or legally with the Court's conclusion on this point, we affirm.

### III.

Having concluded that the Court was correct in finding Talen's entitled to payment for fuel and supplies provided to M/V VENTURE III, we next consider whether the Court was correct in piercing the corporate veil to hold Creppel and Venture Towing, Inc., as alter egos of Venture Marine Enterprises, Inc., liable.

■ It is clear that Admiralty Courts can pierce the corporate veil of a corporation in order to reach the "alter egos" of the corporate defendant directly involved. *Swift and Company Packers v. Compania Colombiana Del Caribe S.A.*, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950). This is especially true where the near identity of two corporations should be disregarded in order to prevent manifest injustice to third parties, *Houston Oil Field Material Co. v. Stuard*, 406 F.2d 1052, 1054 (5th Cir. 1969), or where the separate identity of two corporations should be disregarded where one corporation becomes the conduit of another. *Mayo v. Pioneer Bank & Trust Co.*, 274 F.2d 320, 321 (5th Cir. 1960) (applying Louisiana law).

■ Whether a corporate entity will be disregarded depends upon the trial court's findings of fact. *See George W. Bennett Bryson & Co., Ltd. v. Norton Lilly & Co., Inc.*, 498 F.2d 328, 329 (5th Cir. 1974). The District Court found that the corporate veil here should be pierced to prevent an injustice and accordingly held Creppel and Venture Towing, Inc. liable for the debts of the M/V VENTURE III. The record clearly supports the Court's finding. Creppel's own testimony demonstrates a total domination of both corporations, a confusion of corporate records and finances, and a failure to follow usual corporate formality. Creppel testified that he owns three corporations—J&W Marine Towing, Inc., Venture Towing, Inc., and Venture Marine Enterprises, Inc.—and that from the beginning Venture Marine Enterprises, Inc. was always undercapitalized. Furthermore, he testified that his wife owns fifty percent of the shares and is secretary-treasurer although she does not participate in the operation of the corporations. He is president of all three corporations. The record clearly established that all three corporations have the same office with only one employee working as a bookkeeper, secretary and operations man, and that Creppel does not know which corporation pays that employee.

■ But perhaps the most striking example of non-separateness was the testimony by Creppel of inter-corporate loan transactions. Creppel testified that inter-corporate loans would be made upon his sole discretion by merely transferring the funds from one corporation to another without any loan documentation. He testified that he secured several loans to his corporations with personal shares of stock. And in one example, Creppel stated that he transferred $40,000 from his personal account to the account of Venture Marine Enterprises, Inc., and in turn had Venture Marine Enterprises pay off the indebtedness that Venture Marine Enterprises had to the other two corporations, Venture Towing, Inc., and J&W Marine, Inc. He then had the two corporations transfer the $40,000 right back

So you suggest that 7,656 gallons shown in your gallons could relate to water, is that right?
THE WITNESS: (Creppel)
I am just reading what is on the log, Sir.
THE COURT:
I am asking you is that what you say.
THE WITNESS:
I don't know whether it could or not. The way it is written, it could.

THE COURT:
Do you believe it relates to water?
THE WITNESS:
Probably not.

5. At trial, Creppel, in reviewing the invoices, identified the names of his employees who approved the various invoices acknowledging receipt of the fuel. He also verified all of the log entries of the M/V VENTURE III.

to him. The net effect—which he frankly admitted to the Court—was that he depleted the assets of Venture Marine Enterprises, Inc. to the detriment of its creditors and ended up in a situation in which Venture Towing, Inc. and J&W Marine Towing, Inc. now owe Venture Marine Enterprises, Inc. money which will probably never be paid since Venture Marine Enterprises, Inc. is presently totally insolvent. Creppel's testimony revealed that no interest was charged on these "loans" though he claimed he vigorously negotiated with himself for inter-corporate loans. In addition, Creppel admitted to a number of transactions in which either he or one of the corporations would indiscriminately sign notes or pledge their vessels for the loans of another of the corporations.

The Court found that to "shield his companies from debt by hiding behind the corporate veil would lead to absurd results,

extreme hardship and prejudice to the plaintiff and complete injustice in this case." Hence, the Court concluded that a piercing of the corporate veil was appropriate.

The recent opinion by Judge Schwartz in *Bordagain Shipping Co. v. Saudi-American Lines, S.A.,* 1979 A.M.C. 1058, 1071–72 (E.D. La.1978), *aff'd per curiam,* 623 F.2d 710 (5th Cir. 1980), reaffirms the above holding. In a similar situation the Court there held that where the controlling entity of one corporation siphons off the assets of that corporation into another controlled corporation in order to place the assets of a siphoned corporation beyond the reach of legitimate creditors, justice and equity decree that the Court should pierce the corporate veil with respect to these attempted transfers of assets in order to prevent the innocent creditor from being the victim of what Judge Schwartz termed "reprehensible conduct." *Bordagain,* 1979 A.M.C. at 1073.[6]

---

**6.** Judge Schwartz presents a helpful summary of the law dealing with the piercing of the corporate veil:

Although there are general rules as to when the Court should exercise this power, each case is *sui generis* and must be considered on its own facts. *Fokar Co. v. R.A. Hanson Dise, Ltd.,* (2 Cir., Aug. 16, 1978); accord, *Dobbyns-Taylor [Dobyns-Taylor] Hardware Co. v. United States,* 278 F.Supp. 538, 543 (E.D.Tenn., 1967); *Kingsman Enterprises v. Bakersfield Electric Co.,* 339 So.2d 1280, 1282–83 (La.App., 1 Cir., 1976).

In an appropriate case, the doctrine of "alter ego" may be applied. See, *e. g., Allied Chemical Corp. v. Randall,* 321 F.2d 320, 323 (7 Cir., 1963); *Dillman v. Nobles,* 351 So.2d 210, 213–14 (La.App., 4 Cir., 1977). Under both Louisiana law and federal common law, 11 a finding of control or domination of a corporation by an individual or a corporate entity and the use of the corporate fiction are necessary prerequisites to the application of the alter ego theory of liability. *Noe v. Roussel,* 310 So.2d 806, 826 (La., 1975); *Panther Pumps & Equipment Co., Inc. v. Hydrocraft, Inc.,* 424 F.Supp. 815, 821–22 (N.D.Ill., 1976). Once such a connection is established, it is appropriate to brush aside the corporate veil when it appears a corporation was organized for fraudulent purposes, illegality, or wrongdoing. *In re Ira Haupt Co.,* 289 F.Supp. 966, 971–72 (S.D.N.Y., 1968); *American Anthracite B Coal Corp. v. Amerocean S.S. Co.,* 1955 AMC 653, 131 F.Supp. 244, 248 (E.D. Pa., 1955); *Bossier Millwork & Supply Co. v. D & R Construction Co.,* 245 So.2d 414, 416–

17 (La.App. 2 Cir., 1971); La.Rev.Stat.Ann. sec. 12:95 (West, 1969). Likewise, the fiction of corporate entity will be disregarded when required in the interest of justice. *In re Bowen Transport, Inc.,* 551 F.2d 171, 178–79 (7 Cir., 1977); *American Trading & Production Corp. v. Fischbach & Moore, Inc.,* 311 F.Supp. 412, 416 (N.D.Ill., 1970); *Giuffria Realty Co., Inc. v. Kathman-Landry, Inc.,* 173 So.2d 329, 334–35 (La.App. 4 Cir., 1965). The corporate veil should always be pierced "when the theory of separate entity leads to an absurdity or persons involved in a corporation seek to use the legal fiction to immunize them from the consequences of their fraud or illegal actions," *Haynes v. Champagne Title Corp.,* 228 F.Supp. 157, 159 (E.D. La., 1964) (applying Louisiana law); see also *DeWitt Truck Brokers v. W. Ray Fleming Fruit Co.,* 540 F.2d 681 (4 Cir., 1976); *American Courrier Corp. v. Louisiana Public Service Comm'n,* 256 La. 464, 236 So.2d 802 (La., 1970), or to prevent injustice to third parties, *Houston Oil Field Material Co. v. Stuard,* 406 F.2d 1052, 1054 (5 Cir., 1969); *Lushute v. Diesi,* 343 So.2d 1132, 1135 (La. App. 3 Cir., 1977), *aff'd in part & rev'd in part,* 354 So.2d 179 (La., 1978), or where one corporation becomes the conduit of another, *Mull v. Colt Co.,* 31 F.R.D. 154 (S.D.N.Y., 1962); *In re Gibraltor Amusements, Ltd.,* 291 F.2d 22, 24–25 (2 Cir., 1961); *Noe v. Roussel, supra, Mayo v. Pioneer Bank & Trust Co.,* 274 F.2d 320, 321 (5 Cir., 1960) (applying Louisiana law).

(Emphasis added) (footnotes omitted).

Creppel attempts to overcome the Court's piercing the corporate veil by arguing that since Talen's negligently forwarded its invoices to Venture Towing instead of Venture Marine Enterprises, Inc., he was entitled to rely on these actions for nonpayment. This argument quickly sinks. The evidence at trial clearly indicated that because of Creppel's method of conducting business through its corporations, it was not unusual for vendors to supply invoices to any one of his corporations. This testimony represented still further evidence that the formalities of separate corporations were not maintained by Creppel and that he really did not bother to advise third parties that they were dealing with separate corporations.[7]

The Judge had ample reason to reach his factual findings and he was correct on the legal conclusions announced.

AFFIRMED.

---

7. We reject as insubstantial the contention that the Court erred in allowing the testimony of Creppel's former counsel none of which violated any attorney-client confidences or altered the trial judge's conclusions.