**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 96-30780

K.B.R., INC.,

                                    Plaintiff-Appellant-
                                    Cross-Appellee,

                    versus

L.A. SMOOTHIE CORP.,

                                    Defendant-Appellee-
                                    Cross-Appellant

                    and

A. ALBERT GARDES and STANTON MIDDLETON, III,

                                    Defendants-Appellees

Appeal from the United States District Court
For the Eastern District of Louisiana
(95-CV-116)

January 22, 1998

Before REYNALDO G. GARZA, SMITH, and WIENER, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant-Cross-Appellee K.B.R., Inc. (KBR) appeals

the district court's amended judgment rendered following the motion

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

for a new trial filed by Defendant-Appellee L.A. Smoothie Corporation (LASC) and Defendants-Appellees A. Albert Gardes and Stanton Middleton, III (collectively, Defendants). In its amended judgment, the district court vacated its previous finding of fraud and its determination that the corporate veil should be pierced, and held LASC — but not Gardes or Middleton — liable for breach of contract only. Discerning no reversible error in the district court's resolution, we affirm.

I

FACTS AND PROCEEDINGS

This case stems from a failed joint venture (Venture) between two corporations — KBR and LASC — to create and operate a smoothie store at the corner of Canal Street and St. Charles Avenue in New Orleans. The events leading to this appeal began in 1992 when Richard Kirschman, the sole shareholder of KBR, and Gardes and Middleton, LASC's shareholders,[1] began discussing commercial rental space on Canal Street as a possible location for a smoothie store.[2] The parties had done business together previously.

Middleton and Gardes, on behalf of LASC, attempted to lease the space in conjunction with a sublease to a third party. The

_____

[1]For a period of time, Middleton's father, now deceased, was a LASC shareholder.

[2]For the benefit of those who may not know, a smoothie is a made-to-order beverage blended from a number of available ingredients as selected by the purchaser, and can be obtained from an authorized vendor only.

2

lessor, the Pickwick Club, requested a financial statement from LASC. In response, Middleton and Gardes supplied a financial statement roughly estimating the business's possibilities, which prompted the lessor to require their personal guaranties of the lease. When the potential sublease failed to materialize, LASC abandoned the potential location. According to the Defendants, Kirschman thereafter encouraged them to rent and occupy the entire space alone and to form a joint venture partnership between LASC and KBR.

In late 1992, LASC and KBR formed the Venture as set forth in their jointly-drafted Joint Venture Agreement (Agreement); each was represented by counsel. KBR agreed to contribute $75,000 to construct, furnish, equip and stock the store, and LASC agreed to ensure that these start-up tasks were accomplished according to a comprehensive plan and thereafter to conduct the store's daily operations.

LASC engaged Woodward Construction (Woodward) to build out the store for a contract price of $42,975. The Defendants assert that Woodward requested and received a Venture check of $15,475, which was recorded in the Venture checkbook, when Woodward commenced construction. Woodward erroneously credited this check for work done on the City Park store, a different smoothie store in which KBR and Kirschman had no interest.

The Venture's store at Canal and St. Charles was outfitted

3

with both new and used equipment obtained from another smoothie shop which was closing. The initial inventory comprised new goods. LASC maintains that of Kirschman's $75,000, $42,975 went to construction, $8,800 went to new equipment, and $7,000 went to inventory, leaving $16,000 for the remainder of the equipment.

Middleton and Gardes contend that they entered the Venture in reliance on Kirschman's known expertise in Canal Street business. They insist that neither Kirschman nor his counsel requested financial information prior to executing the Agreement; by the same token, they made no investigation to determine whether Kirschman could meet his initial financial commitments. LASC maintains that it did not have financial information available for its stores at that time, but that commencement of the Venture could have been delayed pending acquisition of such information had it been required.

In contrast, Kirschman contends that in entering the Venture he relied on LASC's pro forma projections —— given to induce his investment —— and on LASC's statement of financial condition provided to the lessor. He maintains that both documents contained false information and failed to disclose material information. According to the Defendants, however, the pro forma consisted of nothing more than Middleton and Gardes' rough estimate of anticipated expenses and necessary sales level, and that the pro forma had been prepared when Kirschman was trying to convince them

4

to lease the downtown space. Kirschman asserts that Middleton and Gardes made false representations as to LASC's estimated sales and expenses, their smoothie expertise, and the existence of a comprehensive plan. Further, Kirschman asserts that the Defendants failed to disclose that the Venture store would be equipped in part with used fixtures from a store of theirs that was closing and that their stores had been unprofitable. Finally, Kirschman emphasizes that he relied on the Agreement's anti-commingling provision in choosing to invest.

The Venture proved unsuccessful. KBR insists that Gardes and Middleton's management skills were deficient and that they kept improper records, even failing for well over six months to obtain the financial data needed to determine whether the business was operating successfully. The Defendants, in contrast, assert that they did all that they could to ensure a successful Venture; they blame the Venture's failure on obstacles unique to the Canal Street location, which led to an increase in the costs of goods sold and caused sales to suffer. The Defendants contend that, even though both parties were aware of the store's problems before its first financial reports were released in July 1993, Kirschman encouraged continued operation.

In March 1994, KBR initiated an arbitration action to void the Agreement and recover damages, alleging fraud. In November 1994, the Defendants filed a petition in state court to enjoin the arbitration. That court granted a temporary restraining order and

5

stayed the pending arbitration.  KBR then dismissed the arbitration proceeding and filed suit in federal district court on a revised claim, alleging violations of federal and state securities laws. The Defendants filed a summary judgment motion, seeking a determination that the Agreement was not a security under the 1934 Securities Act and that, therefore, federal jurisdiction was improper.  The district court denied the motion.

Following a non-jury trial, the district court, in April 1996, entered judgment for KBR against the Defendants in solido for damages, interest, and attorney's fees, finding them liable for fraud, violations of federal securities law, and breach of contract.  The court determined that, as the parties intended that KBR would not have any management role in the Venture, the Agreement was an investment contract under the 1933 Securities Act. It further determined that Kirschman had relied on the anti-commingling provision of the Agreement in making his investment decision and would not have agreed to the alleged violative use of his contribution, i.e., commingling.  The court concluded that KBR's consent to the Agreement was vitiated by fraud, entitling it to rescission and damages.  Finally, the court pierced the corporate veil, holding Gardes and Middleton personally liable to KBR for the damages owed by LASC.

After the Defendants filed a motion for a new trial, the court entered an amended judgment, holding LASC liable for breach of contract only and vacating the previous holdings of fraud and veil

6

piercing, thus relieving the individual defendants from personal liability. In reversing its earlier decision, the court concluded that Kirschman did not rely on the Agreement's anti-commingling provision. Further, the court found that representations in the pro forma made before the Venture was formed did not rise to the level of fraud, and that changes in the figures for costs of goods sold did not cause further damage to the Venture and did not amount to fraud. The court also determined that as the commingling caused no financial harm to the Venture, it did not constitute fraud; but that the commingling was a breach of the Agreement, making LASC liable to KBR for damages. Finally, the court found that, as no legal fraud was proven, KBR was not entitled to pierce the corporate veil. Both parties timely appealed.

## II

### ANALYSIS

KBR asserts that the district court erred as a matter of law in granting the Defendants' motion for a new trial. It also complains that the court erred in finding that Kirschman did not rely on the Agreement's commingling provision in making his investment decision. KBR argues further that the court erred in determining that the Defendants had not committed fraud in the inducement of a contract and that no securities fraud existed. KBR contends that, even assuming that there was no fraudulent conduct, the corporate veil should be pierced, as Gardes and Middleton

7

failed to observe corporate formalities. On cross appeal, the Defendants contend that the district court erred in awarding $52,531 in damages to KBR.

We have now heard the arguments of able counsel, studied their appellate briefs, reviewed the record on appeal, and considered the applicable law. From this review, we are satisfied that the district court committed no reversible error and that the only argument meriting further discussion is whether the corporate veil should be pierced to hold Middleton and Gardes personally liable for LASC's judgment debt.

A. STANDARD OF REVIEW

The decision to disregard a corporate entity "depends upon the trial court's findings of fact."[3] We have noted that "[r]esolution of the alter ego issue is heavily fact-specific and, as such, is peculiarly within the province of the trial court."[4] As such, we apply a clearly erroneous standard of review.[5]

B. APPLICABLE LAW

As a general rule, corporations are distinct legal entities, separate from the individuals who own them, as a result of which

---

[3]Talen's Landing, Inc. v. M/V Venture, II, 656 F.2d 1157, 1160 (5th Cir. 1981).

[4]United States v. Jon-T Chems., Inc., 768 F.2d 686, 694 (5th Cir. 1985).

[5]Id.

8

the shareholders are not liable for the debts of the corporation.[6] This generality is grounded in the theory that insulation of shareholders from personal liability promotes business and industry by allowing investors to use the corporate form to make investments while shielding their personal wealth from business risks.[7] Only in exceptional circumstances may a creditor of the corporation reach a shareholder by piercing the corporate veil and thereby render the individual liable for the corporation's debts or obligations.[8] One such exception is when the corporation is deemed the "alter ego" of the shareholder. This usually involves situations in which the shareholder has practiced fraud or deceit on a third party by acting through the corporation.[9] The corporate veil may be pierced in the absence of fraud, though, when the shareholders disregard the corporate entity to such an extent that the corporation ceases to be distinguishable from its shareholders;[10] but when fraud or deceit is lacking, "other circumstances must be so strong as to clearly indicate that the

---

[6]LSA-R.S. 12:93(B); Riggins v. Dixie Shoring Co. Inc., 590 So.2d 1164, 1167 (La. 1991).

[7]Riggins, 590 So.2d at 1167-68.

[8]Id. at 1168.

[9]Riggins, 590 So.2d at 1168; American Bank of Welch v. Smith Aviation, Inc., 433 So.2d 750, 752 (La.App. 3d Cir. 1983).

[10]Riggins, 590 So.2d at 1168.

corporation and shareholder[s] operated as one."[11]

Courts consider a number of factors in determining whether to pierce the corporate veil, including (1) commingling of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) undercapitalization; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings.[12] No one factor carries the most weight; the "totality of the circumstances is determinative."[13]

C.  PIERCING THE CORPORATE VEIL

KBR insists that here the corporate veil should be pierced, as Gardes and Middleton both committed fraud and failed to follow corporate formalities.  It argues that the district court erroneously reversed its original determination that LASC's corporate veil should be pierced because the court harbored the erroneous belief that a corporate veil could not be pierced absent a finding of fraud.  KBR correctly points out that, even when no fraudulent conduct has occurred, the corporate veil can be pierced for failure to observe corporate formalities.  Relying on the

[11]Cahn Elec. Appliance Co., Inc. v. Harper, 430 So.2d 143, 145 (La.App. 2d Cir. 1983; Kingsman Enters. v. Bakerfield Elec. Co., 339 So.2d 1280, 1284 (La.App. 1st Cir. 1976).

[12]Riggins, 590 So.2d at 1168 (citing Smith-Hearron v. Frazier, Inc., 352 So.2d 263 (La.App. 2d Cir. 1977); Kingsman, 339 So.2d 1280).

[13]Riggins, 590 So.2d at 1169.

10

factors listed above, KBR urges that the corporate veil should be pierced because there was evidence of commingling, undercapitalization, and failure to observe corporate formalities.

Specifically, KBR notes that regular shareholders and directors meetings were not held; and that LASC's minutes reveal that the corporation held only annual meetings and had failed to do even that since 1991. Additionally, KBR points out that the corporation commingled funds by transferring money back and forth between LASC and L.A. Smoothie Franchise, Inc. (a company founded by Gardes and Middleton for the development of LASC franchises) whenever either needed money. KBR notes further that the court found that the Woodward payment constituted commingling of funds. Finally, KBR urges that LASC was undercapitalized, observing that it was unable to make its initial capital contribution to the Venture in December 1992 and that Venture funds were used to pay some costs of construction of LASC's City Park store and rent for LASC's Severn Street store.

The Defendants counter that they did not disregard the corporate entity. They acknowledge that commingling, lack of written minutes of meetings, and borrowing funds from L.A. Smoothie Franchise, Inc. are asserted by KBR, but insist that these incidents are insufficient to entitle KBR to pierce the corporate veil. Instead, argue the Defendants, the evidence indicates that LASC was at all times operated as a corporation. The Defendants maintain that, as LASC (1) was incorporated and maintained its

11

corporate status with the state; (2) filed corporate tax returns; (3) maintained banking and accounting records for a small business corporation; and (4) maintained by-laws and produced minutes of meetings, the district court did not err in declining to pierce LASC's corporate veil.

As a preliminary matter, we disagree with KBR's contention that the reason the district court refused to pierce the corporate veil was its improper belief that the corporate form cannot be disregarded absent fraud. Although the district court did state that "[a]s the Court has now found that no legal fraud was proved, KBR is not entitled to pierce the corporate veil and hold Gardes and Middleton personally liable for the damages it has sustained," this language is not tantamount to a declaration by the district court that the corporate veil cannot be pierced absent fraud; rather, it reflects the court's conclusion that in the absence of fraud the remaining circumstances of this case do not merit piercing the corporate veil.

As we agree with the district court's conclusion that there was no fraud, we analyze the evidence of corporate behavior to determine whether Middleton and Gardes disregarded the corporate form to such an extent that they cannot hide behind the corporate name.[14] To begin with, we here have two business corporations, one

_____

[14]Chaney v. Godfrey, 535 So.2d 918, 919, 921 (La.App. 2d Cir. 1988)(In this suit against the corporation and its four shareholders for breach of an alleged contract, "[s]ince the plaintiffs do not assert that the individual shareholders committed

12

on each side —— KBR and LASC —— all of whose shareholders were fully aware that the business transaction they sought to confect was to be a joint venture of their respective corporations. After reviewing the Agreement, the Assignment for Assumption of Lease, and other documents and correspondence in the record, we conclude that sufficient indicia of "corporateness" existed to support the district court's determination not to pierce the corporate veil.

The Louisiana Supreme Court opinion in Riggins v. Dixie Shoring Company[15] is instructive. There, the court reversed the state court of appeal's determination that the state trial court was justified in concluding that the corporate form should be disregarded and the major shareholder held liable. The Louisiana Supreme Court noted several factors considered by the state trial court in support of its decision to pierce the corporate veil: "1) employees being paid in cash with no records maintained of this; 2) checks from customers of the business that were made out to O.P. and Reginald Bajoie [majority shareholder and his son] individually instead of to the corporation; 3) no corporate minutes kept; 4) property belonging to O.P. Bajoie individually was used by

_____

fraud, they have a heavy burden of proving that the shareholders disregarded the corporate entity to such an extent that it ceased to be distinguishable from themselves."); Welch, 433 So.2d at 755 ("In the absence of fraud on the part of the Smiths [defendants], plaintiff had a heavy burden of proving that they disregarded the corporate entity to such an extent that it ceased to be distinguishable from themselves.")

    [15]590 So.2d 1164 (1991).

13

the corporation without compensation to O.P.; 4) over $100,000 disappeared without explanation between the end of 1986 and the filing of the bankruptcy petition; 6) some of the same equipment used by the corporation . . . being used by the successor business . . .; 7) disbursements made to employees without complete documentation; 8) failure to show that the cash received by cashing the checks made out to the Bajoies individually was deposited into the corporate accounts; and 9) inexact testimony . . . about how cash was handled."[16]

The state trial court also considered facts which militated against piercing the corporate veil. These included: "1) for many years the corporation operated under the corporate name; 2) the corporation maintained checking accounts and filed the appropriate tax returns under the corporate name; 3) the corporation showed profits and paid federal income taxes; 4) the plaintiff testified that he understood that he was dealing with the corporate entity and not O.P. and Reginald individually; 5) O.P. held informal meetings with Reginald about business operations which amounted to a form of Board of Directors meetings; 6) the corporation was properly incorporated under the laws of Louisiana; 7) the corporation had gross receipts of $280,403 in 1985 and $251,963 in 1986; 8) corporate checking accounts were maintained from which significant corporate disbursements were made; and 9) substantial

_____

[16]Id. at 1166-67.

14

sums of money were maintained in the corporate checking accounts . . . ."[17]

In ruling that the corporate veil should not have been pierced, the Louisiana Supreme Court relied on a number of factors, including, but not limited to, the following points. First, there was no evidence that Bajoie used the corporate form to perpetrate fraud. Second, even though some corporate formalities — like Board of Directors meetings — were not followed, most formalities, such as maintaining corporate bank accounts and filing corporate tax returns, had been followed. Furthermore, when corporate formalities such as board meetings were not followed, the shareholders "still ran the corporation basically on a corporate footing; for example, they regularly met informally about business operations which, especially given that this was a small, closely held corporation, sufficed to satisfy the spirit of the requirement."[18] Third, contracts were routinely entered into in the name of the corporation, including those with the plaintiffs, who understood and believed they were contracting with the corporation. Fourth, the court noted that the record did not support the alleged diversion of corporate assets prior to filing the bankruptcy petition. Finally, the Louisiana Supreme Court declared that the uncompensated use of Bajoie's tools and land by the corporation, as

---

[17]Id. at 1167.

[18]Id. at 1169.

well as the failure to keep corporate minutes or maintain a cash journal, were not sufficient derelictions to support piercing the corporate veil when viewed in light of the totality of the circumstances.

Applying Riggins to the totality of the circumstances of the instant case, we conclude that the district court did not commit clear error in refusing to pierce the corporate veil. When the time came to formalize this business deal, the Agreement plainly reflected that two corporations were the only parties forming the joint venture. The Agreement was signed by Middleton and Kirschman in their respective corporate capacities. Moreover, Kirschman signed individually for the express but limited purposes of sections 2.8(f) [confidentiality and noncompetition] and 4.1 [KBR's initial contribution], and Middleton and Gardes signed individually for purposes of section 4.2 [LASC's initial contribution] only.

As for the conduct of business after the Venture had been formed, LASC entered an Assignment and Assumption of Lease Agreement with the Venture in December 1992. In this transaction, Middleton, the assignor, signed the document in his capacity as LASC President; Middleton and Kirschman both signed for the Venture, the assignee, in their respective corporate capacities with KBR and LASC; and Middleton, Gardes, and Kirschman each signed individually as guarantors of the lease. Kirschman cannot be heard to complain that LASC failed to act in its corporate capacity when both he and Middleton, as corporate officers, signed an agreement

with its lessor, The Pickwick Club, assigning LASC's lease to the Venture. Moreover, Kirschman, as a leasing agent with Latter & Blum, had represented The Pickwick Club in finding a lessee for the building. Later, as Pickwick's agent, Kirschman addressed a facsimile transmission to LASC regarding lease compliance. And additional documents in the record reflect correspondence between two corporate entities.[19]

When addressing the observation of corporate formalities, commentators have generally recognized that adherence must be substantial, but that 100 percent observation is not required.[20] We also recognize that this was a small business formed and operated by closely-held corporations that were owned by three individuals who had dealt with one another in the past; and that in such circumstances parties tend to follow fewer formalities without, however, eschewing corporateness altogether. Neither does Louisiana corporate law require perfection;[21] maintaining

---

[19]We recognize that there are also documents addressed to Middleton and Gardes solely as Venture representatives (not LASC representatives), referring to them as "Stan" and "Al", and signed by Kirschman on behalf of KBR. See, Plaintiff's Exhibit 18; Defendant's Exhibit 34h(13). It is important to note, however, that it was Kirschman who assumed a more informal tone in this correspondence rather than Middleton or Gardes.

[20]Riggins, 592 So.2d 1282, 1284 (La. 1992)(Dennis J., concurring in the denial of rehearing)(citing H. HENN & J. ALEXANDER, LAWS OF CORPORATIONS § 146, at 347 (3d ed. 1983)).

[21]See e.g., Chaney, 535 So.2d at 921-22 (circumstances were insufficient to clearly indicate that shareholders and corporation acted as one despite evidence that shareholders often informally met to discuss business without sending notice of a meeting,

17

formalities is not sacrosanct but is merely an indicia of reliance, absent fraud.

Both KBR and LASC were fully aware that this was to be a business venture entered into by their respective corporations. Absent a conclusion of either fraud or alter ego, Kirschman cannot bypass the corporation and satisfy LASC's obligation from the assets of Middleton and Gardes. Instead, he may recover damages only from the corporation; if that pocket proves to be empty, so be it.

## III

## CONCLUSION

After a thorough review of the record, we conclude that, in the Venture, LASC simply was not the "alter ego" of its shareholders and that the Defendants did not disregard the corporate entity to such an extent that it was not — or ceased to be — distinguishable from its shareholders. The district court did not commit clear error when on reconsideration it determined that there was no fraud and that the corporate veil should not be pierced. Accordingly, we

AFFIRM.

---

minutes were not usually kept, and resolutions were reduced to writing only when required by financial institutions).