Oscar ZIMERI and Marie Elena
Mijas De Zimeri

v.

CITIZENS AND SOUTHERN
INTERNATIONAL BANK
OF NEW ORLEANS.

Civ. A. No. 77–2513.

United States District Court,
E. D. Louisiana,
New Orleans Division.

April 1, 1980.

Lawrence Roe Dodd, Baton Rouge, La., for plaintiffs.

Warren M. Schultz, Jr., New Orleans, La., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

Plaintiffs are Oscar Zimeri and his wife, Marie Elena Mijas de Zimeri. Defendant is Citizens & Southern International Bank of New Orleans, hereinafter referred to as "C&S Bank." In 1973, Oscar Zimeri was a partner in a Guatemalan company, Industrias de Algodon, S. A., as were his two brothers, Elias and Jorge. Industrias obtained a loan from C&S Bank in the sum of $380,000. The three brothers guaranteed the debt. Soon thereafter, however, plaintiff discontinued his association with Industrias de Algodon.

About a year later, plaintiff, Oscar Zimeri, was contacted by C&S representatives in 1974. The purpose of this contact was to discuss the mutual advantages of transferring certificates of deposit owned by Marie Elena Mijas de Zimeri from Houston and Miami banks to the C&S Bank. Based on certain assurances by C&S Bank, Mr. and Mrs. Zimeri agreed to make the transfer of funds which eventually amounted to the sum of $671,792. In return, C&S Bank agreed to make various loans to plaintiffs

in order to finance a new business to be operated by them called Filamentos Textiles, S. A. This new venture had absolutely no connection with Industrias de Algodon. Although the loans to Filamentos were guaranteed by the assignment of plaintiffs' certificates of deposit, the guarantee did not, in any way, mention or refer to the Industrias loan. Total sums of these (Filamentos) loans eventually reached the sum of $570,846.25. Although it was first hoped that payments of the Filamentos loans could be made from the interest generated from the certificates of deposits, it soon became apparent that this would not be the case. By December, 1976, the bank was correct in observing that the interest generated from the certificates of deposit was not even coming close to covering the payments required. As a result, it became necessary for C&S Bank to collect the entire amount of the loans by cashing in the certificates of deposit which had a discount value of approximately $665,000. After $586,641.06 ($570,846.25 plus interest and subsequent loans) was collected, the plaintiffs had a remaining balance of $79,296.08. The court is of the view that the action taken by C&S Bank up to this point was essentially within the terms of the agreement between the Zimeris and C&S Bank.

However, C&S Bank went further. Without prior notice, the bank "offset" the remaining balance of $79,296.08 in Mr. and Mrs. Zimeri's account as partial satisfaction of the unpaid Industrias de Algodon indebtedness, which then stood (according to the bank) at $107,021.40. C&S Bank based these actions on the wording in the assignment of the Zimeris' certificates of deposit to C&S Bank which had, clearly, been effected to guarantee the Filamentos loan.

The history of this assignment is material to these deliberations:

In August of 1975, C&S Bank had obtained the assignment from Oscar and Marie Elena Zimeri of their then current (and all subsequent issues, rollovers, etc.) certificates of deposit totaling (at that time) $671,792. On August 25, 1975, Mr. Quay W. Parrott, Jr., the bank's vice-president and manager, acknowledged this transaction and noted that the assignment covered "the technical aspects of collateralizing the *loan which we have granted to you.*"

The court is of the view that the "collateralizing" of the "loan" had only to do with the funds which were being invested by Mr. and Mrs. Zimeri in their venture Filamentos Textiles, S. A. and had no relationship whatsoever to the then troubled Industrias de Algodon, S. A. However, the vehicle by which the "collateralizing" was effected was broadly drawn and apparently provided C&S Bank with the wherewithall to proceed against those certificates of deposit.

That this was clearly not the intention of Mr. and Mrs. Zimeri is manifest from the subsequent exchanges of correspondence between the Zimeris and the bank. However, in the latter part of 1975 and early part of 1976, the bank began to equivocate with respect to its understanding regarding the extent of the assignment—a sort of early warning of its subsequent actions in treating the collateralization of the Filamentos loans as also a collateralization of the loan in favor of Industrias de Algodon. This equivocation continued in August, 1976, when the bank's Mr. Balestra advised the Zimeris that their certificate of deposit had been renewed. He also discussed certain "adjustments" and noted—as of that date—that "funds credited to your open account" had been used to pay "accrued interest in the loans which you incurred . . . with C&S." There was no mention of any outstanding balance due regarding the loan to Industrias. It was only in September of 1976 that Mr. Balestra made the first (though tangential) reference to the Industrias loan, writing—on that date—to Oscar Zimeri with the observation: "We would appreciate it very much if you could influence your brother, Elias, in any way so that the matter with Industrias could come to a solution."

Even so, the exchanges of correspondence in late 1976 (subsequent to the letter of September 21) between Oscar Zimeri and the bank make no mention of any responsibility on the part of Mr. and Mrs. Oscar

Zimeri for the Industrias loan. It was not until December 27, 1976, that the Industrias loan specifically reared its ugly head in any of the considerable exchanges of correspondence between the Zimeris and the bank. On that day, Mrs. Parrott, speaking for the bank, wrote to Mr. Zimeri observing that the Industrias loan had been in arrears for ten months (since February of 1976), going on to say "we decided to offset it (the Industrias indebtedness) against the remaining funds in your account." Then, in that same bizarre letter, which included the observation that the bank appreciated Mr. Zimeri's cooperation and the prompt manner in which he met his responsibilities, the bank went on to state: "Although we were not intending to look at you personally for the ultimate responsibility for Industrias loan, your departure from this Company coupled with the lack of response from your brothers left us in a very precarious position which forced us to proceed as we did." Acknowledging (in the court's view) its unusual position, the bank attempts to explain its decision to "offset" by reminding Mr. Zimeri of "our meeting at the Club Italiano in mid 1976" at which time "we informed you that we could be looking at you to repay Industrias debt."

■ The court is of the view that a series of complexities exist with respect to this matter. First of all, the court concludes that there was—at the time the assignment was signed—mutual mistake and, thus, no meeting of the minds took place between the parties regarding the availability of the certificates of deposit owned by Mr. and Mrs. Zimeri to guarantee the Industrias loan. Secondly, the court concludes that even after it became apparent to Mr. and Mrs. Zimeri and the bank that such interpretation could be placed upon the "collateralized" certificates of deposit, there transpired misleading assurances from the bank that such action—though perhaps unintentionally authorized—would not, in fact, take place.

■ Thus, the court is of the view that sufficient categoric assurances emanated from the bank to Mr. and Mrs. Zimeri which equitably estop the bank from "collateralizing" Mr. and Mrs. Zimeri's certificates of deposit to cover the amount then due on the Industrias loan. Furthermore, the court is of the view that the assignment of the certificates of deposit to the bank should, under all of the circumstances here existent, be equitably reformed[1] so as to provide full guarantees for all of the Filamentos loans but to exclude the Industrias loan.

But, even as the court takes this action, it is aware of Senior District Judge Dawkins' observation in *Burley v. Bastrop Loan Co., Inc.*, 407 F.Supp. 773 (D.C.), that he who seeks equity must do equity. Accordingly, the court turns to a consideration of the matter of Oscar Zimeri's signature, along with that of his brothers, Elias and Jorge, guaranteeing the Industrias loan.

At times pertinent to these proceedings, that loan had been reduced by various payments to a total of approximately $107,000. At about the same time that the developments hereinabove discussed were taking place, C&S Bank was proceeding against the agents of Industrias de Algodon, Lemarco, in accordance with certain guarantees by Lemarco covering the Industrias loan. As a result of such proceedings against Lemarco, the Industrias de Algodon "remaining balance" was reduced to the figure $79,296.08. It is quite remarkable that, according to Mr. Parrott's letter of December 27, 1976, "the total then due by Industrias was $95,174.29 plus interest of $12,027.11, for a total of $107,201.40. The difference between this amount and your $79,296.08 was picked up by Lemarco." It is an amazing coincidence that the exact balance due on the Industrias indebtedness was exactly the same amount—to the penny—that remained in Mr. and Mrs. Zimeri's account.

■ Even so, since Mr. and Mrs. Oscar Zimeri seek equity, they must do equity, and, for that reason, the court is obliged to

1. See *Rougeau v. State Farm Mutual Automobile Ins. Co.*, 262 So.2d 803 (La.App.), *Ferguson v. Belcher & Son*, 230 La. 422, 88 So.2d 806, and *Reynaud v. Bullock*, 195 La. 86, 196 So. 29.

enforce C&S Bank's claim on the Industrias loan to the extent of obliging Oscar Zimeri to be responsible for his virile share—one-third of $79,296.08.

Accordingly, there will be judgment herein in favor of Oscar Zimeri and Marie Elena Mijas de Zimeri and against Citizens and Southern International Bank of New Orleans in the amount of $52,866.70 with interest from the date of entry of judgment. Each party to these proceedings shall bear their own costs. Counsel for plaintiffs is instructed to prepare a judgment consistent with these findings and conclusions.

