Oscar ZIMERI and Marie Elena Mijas De Zimeri, Plaintiffs-Appellees,

v.

CITIZENS AND SOUTHERN INTERNA-TIONAL BANK OF NEW ORLEANS, Defendant-Appellant.

No. 80–3493.

United States Court of Appeals, Fifth Circuit.

Dec. 28, 1981.

Rehearing Denied Feb. 1, 1982.

Warren M. Schultz, Jr., New Orleans, La., for defendant-appellant.

Dodd, Achee & Burt, Lawrence Roe Dodd, Baton Rouge, La., for plaintiffs-appellees.

Before BROWN, COLEMAN and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The debtor of a bank seeks to avoid the bank's application of the balance due him on a certificate of deposit to a debt he had earlier guaranteed. The trial court found that the instrument by which the debtor assigned the certificate was executed as a result of mutual mistake and also that the bank was estopped from making the set-off. Accepting the determination that the assignment was the result of mutual mistake, we hold that that finding was irrelevant to whether the bank had the right to make the challenged offset and disagree with the conclusion that the bank was estopped from doing so; therefore, judgment is entered in the bank's favor.

## I.

Oscar Zimeri and his wife, Marie Elena Mijas de Zimeri, are citizens of Guatemala. Zimeri and his two brothers, Jorge and Elias, owned a Guatemalan textiles firm, Industrias de Algodon, S.A. ("Industrias"). In 1973, Industrias purchased machinery and equipment from a New Orleans exporting firm. To finance this purchase, Industrias obtained a $380,000 loan ("Industrias loan") from Citizens and Southern International Bank of New Orleans ("C&S"). Zimeri and his brothers each personally and unconditionally guaranteed the Industrias loan, both by executing the note as accommodation parties and by executing a separate continuing guaranty ("Industrias continuing guaranty"). The continuing guaranty specified that each guarantor was bound for the payment of the guaranteed debt in full and that C&S was not required to resort to Industrias or any other person before proceeding against any guarantor. The guaranty also stipulated that it was secured by "all monies, securities or property of [any] guarantor" that might come into C&S's possession, "including money on deposit ... and [any] checking or savings account of [any] guarantor."

By early 1974, Zimeri had withdrawn from active management of Industrias and founded his own firm, Filamentos Textiles, S.A. ("Filamentos"). To obtain financing for this new venture, Zimeri and his wife agreed to transfer funds to C&S, to be invested in certificates of deposit, in exchange for C&S's agreement to make from time to time personal loans ("Filamentos loans") to the Zimeris. Though the Filamentos loans would carry an interest rate two percentage points higher than that paid on the Zimeris' certificates of deposit, it was expected that the interest earned on the certificates would be more than sufficient to pay the interest due on the loans because it was anticipated that the amount of the loans would be well below the amounts on deposit. The surplus thus generated would be added to the Zimeris' certificates.

The first transfer of funds to C&S under this arrangement was made in April 1974. On May 1, 1974, Zimeri and his wife executed separate continuing guaranties ("Filamentos continuing guaranties") of "any indebtedness" either of them owed or might come to owe to C&S, up to the amount of $200,000, specifically pledging their certificates of deposit as collateral. Also on that date, C&S made the first of the ten Filamentos loans made to the Zimeris between that date and May 1975. The promissory note signed by the Zimeris on that occasion, as well as on the nine others, stated:

> The property described on the reverse hereof [the "various certificates of deposit . . . now held and may be subsequently delivered" to C&S], . . . are hereby pledged . . . to secure the payment of this note, . . . as well as for the payment of any other obligation or liability, direct or contingent, of any of the parties hereto to [C&S], whether due or to become due . . . .

The final document executed by the Zimeris was an "Assignment of Deposit Account" ("assignment"), dated August 20, 1975, assigning the Zimeris' certificates of deposit to C&S.

By mid-1976, the principal amount of the Filamentos loans, approximately $565,000, had grown to such an extent relative to the amount of the funds on deposit, approximately $670,000, that, contrary to the parties' earlier expectations, the interest earned on those deposits was no longer sufficient to meet the interest due on the loans. Consequently, a current balance in favor of C&S began to accrue which, despite repeated requests from C&S, the Zimeris failed to pay off. Meanwhile, Industri-

as, though it had earlier reduced the principal amount on its loan to approximately $95,000, had been in default since February 1976.

Therefore, on December 17, 1976, both Industrias and the Zimeris having been in default on their respective obligations for some months, C&S effected the following transactions: (1) it redeemed the Zimeris' certificates of deposit for a net[1] credit to their account of $665,937.14; (2) it debited the Zimeris' account in the total amount of the principal and interest then due on the Filamentos loans, $586,641.06; and (3) it applied the remaining balance, $79,296.08, to the amount, $107,201.40, then due on the Industrias loan guaranteed by Senor Zimeri.[2]

On August 12, 1977, the Zimeris filed suit alleging that C&S had "willfully and wrongfully" applied the balance of the Zimeris' funds remaining after the Filamentos loans had been paid off, i. e., the $79,296.08, to the Industrias debt. Essentially, they claimed that C&S made representations to them throughout the entire period of their banking relationship that their certificates of deposit would not be used to satisfy Zimeri's liability on the Industrias loan.[3]

In his reported decision, 486 F.Supp. 850 (E.D.La.1980), the district judge focused largely on the circumstances leading up to the August 1975 assignment and concluded that the Zimeris intended it to relate only to the Filamentos loans. 486 F.Supp. at 851. The court went on to hold that "there was—at the time the assignment was signed—mutual mistake and, thus, no meeting of the minds took place between the parties regarding the availability of the cer-

---

1. In accordance with federal regulations, C&S charged the Zimeris a small penalty for the early redemption of their certificates of deposit.

2. The balance of the amount due on the Industrias loan, $27,905.32, was then picked up by the New Orleans exporting firm which had originally sold the equipment to Industrias.

3. The Zimeris also raised a number of other theories of relief in the court below. For example, they claimed that Zimeri's signatures on the Industrias note (as an accommodation par-

ty) and the Industrias continuing guaranty were forgeries, or that, if real, Zimeri was mentally incompetent to enter into those contracts. The district court, however, addressed only those claims based on the alleged representations referred to above. Because the Zimeris as appellees have relied for affirmance exclusively on the district court's opinion, and finding no merit to these other claims in any event, we limit ourselves to a consideration of the issues ruled upon by the court below.

tificates of deposit owned by [the] Zimeri[s] to guarantee the Industrias loan." *Id.* at 852. The district judge, therefore, held that the assignment should be "equitably reformed so as to provide full guarantees for all of the Filamentos loans but to exclude the Industrias loan." *Id.*

More generally, and, as will be discussed below, more importantly, the court found that "sufficient categoric assurances emanated from [C&S] to [the] Zimeri[s] which equitably estop the bank from 'collateralizing' [the] ... certificates of deposit to cover the amount ... due on the Industrias loan." *Id.* Recognizing that reformation and estoppel are equitable remedies, and that "he who seeks equity must do equity," the court allowed C&S to retain one-third of the $79,296.08, Zimeri's "virile share" of the Industrias debt,[4] and thus entered judgment for the Zimeris in the amount of $52,866.70, *i. e.*, two-thirds of $79,296.08. *Id.* at 853. C&S appeals.

## II.

■ The district court's finding that the August 1975 "Assignment of Deposit Account" was the result of mutual mistake and thus should be equitably reformed, though not "clearly erroneous" under Fed. R.Civ.P. 52(a), is irrelevant, in and of itself, to the question whether C&S was justified in applying part of the Zimeris' certificates of deposit to the Industrias debt. The assignment did no more than give C&S a preferred position with respect to those deposits vis-a-vis other Zimeri creditors. The documents that specifically gave C&S the

right to apply the certificates to the Industrias debt were, as noted above, the Industrias continuing guaranty, the Filamentos continuing guaranties, and the ten Filamentos notes.[5] Therefore, if the district court's conclusion that C&S wrongfully applied the certificates to the Industrias debt is correct, it can be only because C&S was equitably estopped from doing so, as the court below also found.

■ Under Louisiana law, equitable estoppel is defined as "the effect of the voluntary conduct of a party whereby he is barred from asserting rights against another party justifiably relying on such conduct and who has changed his position to his detriment as a result of such reliance." *Wilkinson v. Wilkinson*, 323 So.2d 120, 126 (La.1975). Thus, the three essential elements of estoppel are: (1) a representation; (2) justifiable reliance on the representation; and (3) a change in position to one's detriment as the result of such reliance. *Id.* Moreover, because estoppels bar the assertion of otherwise valid legal rights, they are not favored, *id.*, and will be applied only when each of the above elements is proved with "unusual clearness." *See, e. g., Rodden v. Davis*, 293 So.2d 578, 582 (La.Ct. App.), *cert. denied*, 296 So.2d 832 (La.1974).

■ As noted, the district court found that "categoric assurances emanated" from C&S to the Zimeris that their certificates of deposit would not be used in payment of the Industrias loan. Assuming that the Zimeris proved the existence of these representations with "unusual clearness,"[6] and

4. C&S contends that, even if the district court's opinion is correct in all other respects, Zimeri's one-third "virile share" of the Industrias debt should have been computed as one-third of $107,201.40, the total amount due on the Industrias loan as of December 17, 1976, rather than one-third of $79,296.08, the amount remaining in the Zimeris' account after their certificates of deposit were redeemed and the Filamentos loans paid off. Because of our resolution of this case, *see* Part II *infra*, we need not reach this issue.

5. Moreover, C&S contends that, even without express agreement, a bank may apply a debtor's deposits against the debtor's debts to the

bank as they mature, citing *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823 (5th Cir. 1959), *cert. denied*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960); *American Bank & Trust Co. v. Morris*, 16 F.2d 845 (5th Cir. 1927); *cf. SEC v. Affiliated Investment Corp.*, 298 F.Supp. 178 (W.D.La.1968), *aff'd per curiam*, 409 F.2d 570 (5th Cir. 1969); *Dauzet v. Simmesport State Bank*, 167 So.2d 681 (La.Ct.App.1964). We need not, however, rule upon the validity of this contention.

6. In fact, we have doubts that the Zimeris' proof on this point is properly so characterized. The only witnesses for the Zimeris at trial were the Zimeris themselves. The testimony of Mrs.

further assuming that these "assurances" were made after the signing of the last contract authorizing C&S to apply the certificates to the Industrias loan,[7] *i. e.*, the tenth Filamentos note, the Zimeris' estoppel argument still must fail: they did not show that they changed their position to their detriment as a result of their reliance on C&S's assurances. In fact, by the time of that last promissory note, the Zimeris had long since transferred to C&S all the funds in question. The only possible "change" in their position was *not* withdrawing the funds from C&S before it made the set-off. But there was a strong, independent reason why the Zimeris did not do so: those funds secured their Filamentos loans. Therefore, since no detrimental change in position was or could have been shown, C&S was not estopped from applying the Zimeris' certificates to the Industrias debt even if it did make assurances to the Zimeris that it would not do so.

For these reasons the judgment is REVERSED and judgment is entered in favor of C&S and against the Zimeris.

---

Zimeri (for example, "they assured us every time, 'don't worry, we are trying to help you' ") was vague in the extreme. The testimony of Mr. Zimeri was somewhat more specific, but even he said only, in essence, that it had been agreed that the Filamentos loans "would have nothing to do with" the Industrias loan. To the same effect is a letter, heavily relied upon by the Zimeris, sent by C&S shortly after the parties had agreed upon the terms of the Filamentos financing arrangement. It stated, "We . . . confirm that we are extending to you personally, without any relationship to Industrias . . . , a line of credit . . . ." It seems to us that this language, far from being a "categoric assurance" that the funds deposited by the Zimeris to secure their line of credit would never be used by C&S to satisfy Zimeri's contingent liability on the Industrias loan, was instead no more than, as the bank contends, a reassurance to the Zimeris that Industrias, whose management Zimeri had been squeezed out of by his brothers, would have no claims on the proceeds of the Filamentos loans. Because we resolve the estoppel issue on other grounds, however, we need not definitively decide whether the Zimeris met the high standard of proof referred to in text.

7. Any assertion that such "assurances" were made prior to that time is tantamount to a claim that a separate, oral agreement existed which modified the parties' written contract. Under Louisiana law, parol evidence is inadmissible to vary or contradict the unambiguous terms of a written agreement, *see Washington Aluminum Co. v. Pittman Constr. Co.*, 383 F.2d 798, 801 (5th Cir. 1967), which the signers thereto, even when illiterate, are presumed to have understood and assented to, *Jackson v. Continental Cas. Co.*, 402 So.2d 175, 180 (La.Ct. App.1981), *quoting Snell v. Union Sawmill Co.*, 159 La. 604, 105 So. 728 (1925), unless the parol evidence is introduced to attack the validity of the written agreement on grounds of fraud or mutual mistake, *Weber v. H. G. Hill Stores, Inc.*, 210 La. 977, 987–994, 29 So.2d 33, 37–38 (1946).

With regard to these principles, we note first that the Zimeris alleged neither fraud nor mistake with particularity in their complaint, as required by Rule 9(b) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 9(b). Assuming arguendo that this procedural defect would not prevent the consideration of the parol evidence, we note further that the Zimeris at trial specified only fraud as the basis for their introduction of the parol evidence. The district court stated at the end of trial, (though not in his written opinion), however, that C&S had made no "material misrepresentations." Such, of course, would be necessary for a finding of fraud. The C&S "assurances," therefore, could only have been considered as partly establishing the basis for an estoppel. And furthermore, because the Zimeris signed at least thirteen contracts granting C&S the right to make the challenged set-off, it would be essential for those assertions to have been made subsequent to the last such contract.