E.T.P.M.-U.S.A., INC.

v.

NATURAL GAS PIPELINE COMPANY OF AMERICA.

Civ. A. No. 82–1756.

United States District Court, E.D. Louisiana.

July 6, 1984.

Gerard T. Gelpi, Gelpi, Sullivan, Carroll & Laborde, New Orleans, La., for plaintiffs.

S. Gene Fendler, Liskow & Lewis, New Orleans, La., for defendant.

CHARLES SCHWARTZ, Jr., District Judge.

This bifurcated matter was tried before the Court, sitting without a jury, on a former day, on the insurance defenses raised by the defendant. Following the trial on these issues, this matter was taken under submission; after consideration of the of the record herein, the evidence adduced at trial, the memoranda of counsel, and the law, the Court finds as follows.

To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

The parties stipulated to the following facts:

1. E.T.P.M.–U.S.A., Inc. (ETPM) is a Texas corporation engaged in offshore construction.

2. Compagnie d'Assurances Maritime Aeriennes et Terrestres (CAMAT) is a French insurance company which issued a policy of French hull insurance (No. 54,472/FJ) covering, *inter alia*, the derrick lay barge ETPM 1601 (the CAMAT policy).

3. Natural Gas Pipeline Company of America (NGP) is a Delaware corporation engaged in the offshore oil industry.

4. Northwest Insurance Company is a foreign insurance company and the issuer of a policy of Comprehensive General Liability insurance (No. SR 34788) in behalf of ETPM (the Northwest policy).

5. In December 1978-January 1979, NGP invited bids on a combined project involving the construction of two pipelines in Ship Shoal Block 272 and West Cameron Block 537, located offshore Louisiana, Gulf of Mexico.

6. The proposed terms of NGP's project were set forth in a document entitled "Specifications Dated December 15, 1978 Covering Construction of Ship Shoal Block 272 and West Cameron Block 537 Lateral Facilities Offshore Louisiana, Gulf of Mexico" (the Construction Contract).

7. On January 12, 1979, ETPM responded to NGP's invitation to bid, and NGP accepted ETPM's bid on January 23, 1979.

8. The Construction Contract was executed in or about April, 1979.

9. The provisions regarding insurance were set forth in Part 111 of the Construction Contract. Section .2 of Part 111, entitled INSURANCE COVERAGE TO BE FURNISHED BY CONTRACTOR, imposed the following obligations on ETPM:

.21 Contractor shall procure within the time provided, and during the entire period of this contract, maintain and continue in force, from reliable insurance companies acceptable to Company and by forms of policy approved by it, the following minimum coverages:

\* \* \* \* \* \*

.216 Water Craft Liability:

.2161 Contractor using owned vessels or vessels operated for Contractor or its subcontractor shall provide Hull Insurance in an amount equal to full value of each vessel or vessels. Insurance shall include full Collision Liability where said vessels are engaged in towing operations and shall further include full Tower's Liability.

.2162 Protection and Indemnity insurance to be provided in an amount equal to the full value of all vessels owned and/or operated by or for the Contractor.[1]

.2163 Excess Protection and Indemnity Collision Liability Insurance in an amount up to $1,000,000.00 for vessels

owned and $100,000.00 for vessels subcontracted.

.2164 Waiver of Subrogation against the owner, the individual joint ventures thereof, and their officers and employees and agents.

10. Paragraph .213 of the Construction Contract required ETPM to obtain comprehensive general liability insurance which contained a "waiver of subrogation against the owner, and the individual joint ventures thereof, their officers and employees and agents."

11. The insurance provisions of the Construction Contract, set forth in Part 111 thereof, were drafted by NGP.

12. There is no evidence that the insurance provisions of the Construction Contract were the subject of any negotiation between NGP and ETPM.

13. In the course of performance of the Construction Contract, a pipeline belonging to Tarpon Transmission Company (Tarpon) was ruptured. In May 1979, Tarpon notified ETPM that its pipeline, located in the vicinity of the work being conducted by ETPM, had been damaged, and Tarpon claimed that ETPM was responsible for the damage.

14. At all pertinent times, the derrick lay barge under charter to ETPM that was alleged by Tarpon to have struck its pipeline (DLB 1601) was insured under the hull policy written by CAMAT. This policy was obtained through the brokerage firm of Societe Faugere & Jutheau. (Faugere & Jutheau).

15. The Tarpon claim was paid by CAMAT under the CAMAT policy, which covered the loss, for $1.8 million.[2]

16. ETPM brought this suit against NGP alleging that NGP's negligence in furnishing inaccurate drawings of the work area caused ETPM's vessel to rupture the

1. Under Section .2136 of Part 111, E.T.P.M. was authorized to obtain removal of the "watercraft" exclusion from the Comprehensive General Liability Property Damage Policy required by Section .213 as an alternative to obtaining the Protection and Indemnity insurance required by Section .2162.

2. A Protection and Indemnity policy insuring ETPM and underwritten by CAMAT was also in effect at the time of the incident, as was the Northwest policy.

Tarpon line. CAMAT has been named an additional plaintiff as the real party in interest. In this litigation, CAMAT and ETPM are seeking to recover from NGP the amount paid to settle the Tarpon claim.

17. Article V of the Particular Conditions of the CAMAT policy contained the following language:

ARTICLE V—WAIVING OF CLAIMS

The insurers accept the consequences of the claim waiving clauses which appear in the conditions of the contract which bind the insured to the contractors and/or subcontractors and/or associates doing the work with it, for it.

18. The Northwest policy provided primary liability coverage in the event a "difference in conditions" existed between the Northwest and CAMAT policies.

19. NGP contends that the provisions of the CAMAT policy and/or the insurance provisions of the Construction Contract bar CAMAT from any recovery against NGP arising out of the latter's alleged negligence.

NGP's defense to this lawsuit is based upon the language of the Construction Contract and of the CAMAT policy. NGP contends that the language of the insurance provisions of the contract, as set forth above, obligated ETPM to obtain hull insurance with regard to DLB 1601 and to assure that the hull insurance contained a waiver of subrogation against NGP. NGP further contends that such a waiver of subrogation was effected in the CAMAT hull policy, and/or that it is an additional assured under the policy. NGP asserts that CAMAT is, therefore, barred from recovering on its claims of negligence against NGP. In addition, NGP contends that even if the CAMAT policy did not contain a waiver of subrogation against NGP, CAMAT is barred from recovery by virtue of ETPM's alleged failure to procure such a waiver in fulfillment of the insurance obligations of the Construction Contract.

Plaintiffs, ETPM and CAMAT, assert that the CAMAT policy did not provide for a waiver of subrogation against NGP. However, plaintiffs contend that the Construction Contract did not obligate ETPM to assure that the hull policy contained a waiver of subrogation in NGP's favor, since the term "owner," as set forth in paragraph .2164, refers to owners of vessels owned or chartered by ETPM to build the NGP pipeline. Plaintiffs further contend that even if that provision of the Construction Contract contemplated a waiver of subrogation against NGP, ETPM discharged that obligation by obtaining the Northwest policy, which provided primary coverage wherever there was a "difference in condition" between the Northwest policy and the CAMAT policy. In addition, plaintiffs assert that if the CAMAT policy is construed to contain a waiver of subrogation in favor of NGP, then NGP could invoke that provision only if its negligence arose from acts undertaken by it as "owner" of the vessel in question; plaintiffs contend that the alleged negligent acts of NGP were not the acts of an "owner." Finally, plaintiffs contend that, because NGP reviewed and approved certificates of insurance which made no reference to the CAMAT policy, it has waived its insurance defense and should only be allowed to offset against any judgment entered against it the amount of any premiums paid by it to insure such liability.

NGP was a joint owner, along with Transcontinental Pipeline Company, of the pipeline which was the subject of the Construction Contract.[3] The specifications for the work involved in the construction of the pipeline were drafted by NGP's project engineer, and its construction department.[4]

The central dispute concerns the interpretation of the CAMAT policy. That policy was placed by ETPM's parent company, E.T.P.M., S.A. Part of the dispute between the parties concerns the literal translation of the French policy into English. Plaintiffs submit that Article I of the particular

---

3. Trial Tr. p. 21.

4. Trial Tr. p. 17–18.

Conditions of the policy translates as follows:

> ... the undersigned companies insure ETPM
>
> Societe Entrepose G.T.M. pour les Travaux Petroliers Maritimes
>
> Courcellor II—33/35 rue d'Alsace
>
> 92531 LEVALLOIS PERRET CEDEX

for the account of its installation at Sharjah—acting both for its own account as well as that of all companies of its group and of all the companies with which it has community of interest or which take part with it in its operations as well as for the account of its *contractors*, co-contractors and sub-contractors.[5] (Emphasis supplied.)

Plaintiffs further submit that Article V of the Particular Conditions of the policy translates as follows: [6]

> The insurers accept the consequences of the claim waiving clauses which appear in the conditions of the contract which bind the insured to the *contractors* and/or sub-contractors and/or associates doing the work with it, for it. (Emphasis supplied.)

In support of their position, plaintiffs introduced the testimony of Phillippe Petitfrere, a French national who was formerly employed by ETPM as vice-president of finance and administration. In that capacity, Mr. Petitfrere was responsible for the supervision and implementation of the company's insurance program. He testified concerning the literal translation of the word "maitre d'oeuvre," which he stated is continuously used in French contracts. According to Mr. Petitfrere, under French law as it relates to the construction industry, the established meaning of the word is "contractor," specifically, "the one that does work on behalf of someone else." [7] He further testified that the term "maitre de l'ouvrage" describes the "principal" or "client" for which the "maitre de l'ouvre" performs the work.[8] The witness added that he did not believe that the term "maitre d'oeuvre" could connote "operator" as used in the context of the provision quoted above.[9]

NGP contends that the proper translation of this term in Articles I and V of the Particular Conditions is "operators," rather than "contractors." In support of this contention, NGP introduced into evidence the English translation of the CAMAT policy which was provided to ETPM by Marsh & McLennan, the insurance agent and broker which represented ETPM in the United States during the period of time pertinent to this litigation.[10] The evidence shows that this version of the policy was prepared by a translation service in Houston. The translation of Article I provides, in pertinent part, that underwriters insure:

> "ETPM acting on its own behalf and for the companies in its group and all the companies with which it has common interests or which participate with it in its operations, as well as on behalf of its *contracting operators*, cocontractors

---

5. Article I reads, in pertinent part:
   "... les compagnies soussignees assurent a:
   ------
   E.T.P.M.
   Societe Entrepose G.T.M. pour les Travaux Petroliers Maritimes:
   Courcellor II—33/35, rue d'Alsace
   92531 LEVALLOIS PERRET CEDEX
   pour le compte de son etablissment de Sharjah ------ agissant tant pour son compte que pour celui de toutes les societes de son groupe et de toutes les societes avec lesquelles elle a des communautes d'interets ou qui participent avec elle a ses operations ainsi que pour le compte de ses maitres d'oeuvres contractants, co-contractants et soustraitants."

6. Article V reads as follows:

"Les assureurs acceptent les consequences des clauses de renonciation a recours firugant dans les Cahiers des Charges liant l'assure aux maitres d'oeuvres et/ou soustrants et/ou associes effectuant de travaux avec elle, pour elle."

7. Trial tr. pp. 47 and 54.

8. Trial tr. p. 54; see also, Defendant's Exhibit 3, English translation of ETPM Third Party Liability Umbrella Policy in which the term "maitres d'ouvrage" is translated to "operator-clients."

9. Trial Tr. p. 59.

10. Defendant's Exhibit 2.

and subcontractors ......." (Emphasis supplied.)

The Marsh & McLennan translation of Article V provides as follows:

"The Insurers accept the consequences of waiver-of-recourse clauses included in the Conditions of Contract binding the Insured and the *operators* and/or subcontractors and/or associates carrying out works with or for him." (Emphasis supplied.)

The Court finds that the provisions of Articles I and V of the Particular Conditions of the CAMAT policy are subject to either of the English translations submitted by the parties. However, the Court further finds that "contractor" is the more commonly accepted English translation of the term "maitres d'oeuvre" as used in those provisions of the policy.[11]

At the trial of this matter, NGP attempted to show that both Marsh & McLennan and Faugere & Jutheau construed the CAMAT policy in a manner consistent with NGP's defense under the policy. To the extent that such a factual finding would be probative of the construction of the policy, the Court addresses these factual contentions of the defendant.

There is insufficient probative evidence upon which to base a finding of fact on whether Faugere & Jutheau construed the CAMAT policy as containing a blanket additional assured provision and/or a waiver of subrogation where required by contract with regard to principals and clients of ETPM. In this regard, defendant introduced into evidence a letter of February 28, 1979 from a representative of Faugere & Jutheau to Marsh & McLennan which reads in pertinent part:

"As you may read in the policies 54,472/FJ and 54,473/FJ, the contractors, co-contractors or su[b]-contractors are co-insured with E.T.P.M. Consenquently C.C.O. and G.C. are insured under the above mentioned marine policies."[12]

Defendant apparently contends that "C.C.O. and G.C." were other principals of ETPM which were considered omnibus assureds under the policy. However, the evidence also indicates that Corpus Christi Oil and Gas Company and others were granted specific waivers of subrogation and named additional assureds on the policy in question, which provisions were indicated on Certificates of Insurance issued by Marsh & McLennan.[13] Defendant concedes that this was not done in the instant case, but relies on the purported blanket provisions of the CAMAT policy. Defendant has not proven by a preponderance of the evidence that Faugere & Jutheau construed the policy to contain such a blanket waiver of subrogation operating to NGP's benefit or a provision whereby NGP would be considered an additional assured.

The Court further finds that there is insufficient probative evidence to support defendant's contention that Marsh & McLennan construed the CAMAT policy as containing a blanket additional assured provision and/or a waiver of subrogation where required by contracts between

---

**11.** It should be noted that the terms of the French policy in dispute and translations of those terms submitted by the respective parties are as follows:

| Policy Term | NGP | ETPM/CAMAT |
|---|---|---|
| maitres d'oeuvres contractants (in Article I) | contracting operators | contractors |
| maitres d'oeuvres (in Article V) | operators | contractors |

The Court notes that there appears to be some discrepancy in the translation of these terms as submitted by plaintiffs, since plaintiffs assert that both of the French terms set forth above translate into "contractors." However, the only evidence submitted by the parties distinguishing the two phrases is the Marsh & McLennan translation introduced into evidence by NGP.

**12.** Defendant's Exhibit 20.

**13.** Defendant's Exhibits 18 and 19; Plaintiffs' Exhibits 13, 14 and 17.

ETPM and its principals or clients. Defendant offered the testimony of George Dobbin, Senior vice-president and manager of the marine department for Marsh & McLennan, in support of that contention. Mr. Dobbin testified that requests from companies for whom ETPM worked that they be afforded waiver of subrogation and additional assured rights were made through ETPM to Marsh & McLennan. ETPM provided Marsh & McLennan with the contractual insurance requirements and requested certificates reflecting such coverage. ETPM relied on Marsh & McLennan to assure that coverage required by contract was provided.[14] It was Mr. Dobbin's understanding that based upon the translation of the French policy procured by Marsh & McLennan, it concluded that ETPM's principals were omnibus assureds under Article I of the Particular Conditions and benefitted from a blanket waiver of subrogation under Article V.[15]

However, apparently, as of July 11, 1979, at least one representative of Marsh & McLennan did not construe the policy to contain such an omnibus assured provision in favor of ETPM's clients where required by contract.[16] Furthermore, Certificates of Insurance under the CAMAT policy which were issued to various companies contain the notation "Special Clauses or Conditions: ... 3. Underwriters hereby grant Waiver of Subrogation in favor of: " with a blank following that language.[17] This indicates that the specific naming of the party to be benefitted by the waiver subrogation was contemplated, particularly in view of the fact that certain companies did, in fact, receive such specific waivers.[18] In sum

and substance, the Court concludes that defendant has not proven that Marsh & McLennan and Faugere & Jutheau construed and interpreted the policy of insurance to provide that NGP would be an additional assured and that subrogation would be waived against NGP.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the present controversy, pursuant to 28 U.S.C. § 1333, which provides for original jurisdiction of the federal district court over admiralty and maritime claims.[19]

■ In construing the policy of marine hull insurance, federal maritime law is applicable; however, in the absence of federal statutes or judicially established federal admiralty law, the district court should look to the appropriate state law for guidance. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955).

■ The pertinent provisions of the CA-MAT policy, specifically, Articles I and V of the Particular Conditions, are ambiguous. Since the insurance contract is ambiguous and susceptible of more than one interpretation, parol evidence is admissible to clarify ambiguities and to show the intentions of the parties. *Talen's Landing, Inc. v. M/V Venture*, 656 F.2d 1157 (5th Cir., 1981).

The ambiguity of Article I does not require construction in favor of NGP and against the insurer.

---

14. Deposition of Melanie Huff, pp. 10–11.

15. Trial Tr. pp. 27–30.

16. Defendant's Exhibit 21, Letter of July 11, 1979 from Alexander P. Mota to Faugere & Jutheau states in pertinent part:
"As you know, the current placement does not contain blanket naming of additional assureds although it does provide blanket waiver of subrogation by underwriters, if required by contract."

17. Plaintiff's Exhibit 12.

18. Plaintiff's Exhibits 13 and 14. See also, Plaintiff's Exhibit 11, Marsh & McLennan Certificate of Insurance relative to coverage under the Northwest policy which includes the specific notation of "Waiver of Subrogation—Blanket Additional Assured as required by contract."

19. The central issue before the Court relates to the interpretation of a contract of marine insurance, which is clearly within the admiralty jurisdiction of the Court. *Offshore Logistics Services, Inc. v. Mutual Marine Office, Inc.*, 639 F.2d 1168 (5th Cir.1981), rehearing denied 647 F.2d 1121.

"The general rule that doubtful language contained in an insurance policy is to be construed in favor of insured and against insurer ... operates only after insured has been determined and not in deciding whether a certain individual belongs to the insured class described in the policy, and a third person who is not a party to a contract of insurance usually is not entitled to a strict construction in his favor in determining whether the contract was made for his benefit." 44 C.J.S. Insurance § 308, p. 1226, quoted in *Milchem, Inc. v. M.A. Smith Well Service, Inc.,* 351 F.Supp. 1307, 1311 (E.D. La.1972).

Thus, NGP has the burden of proving by a preponderance of the evidence its defense based upon the additional assured provision of the policy.

■ The Court finds that NGP has failed to carry its burden of proving that the parties to the CAMAT policy intended to grant additional assured status to parties, such as NGP, for which ETPM contracted to perform work. In Article I, the phrase "as well as ... the [contractors/contracting operators], co-contractors and sub-contractors" attempts to describe those classes of parties with whom ETPM has contracted, which are granted additional assured status. The fact that the provision is subject to varying translations is a primary source of its ambiguity. If the translation with the term "contracting operators" is utilized, it would be clear that parties such as NGP are additional assureds under the policy. Thus, plaintiffs' contention that the provisions applied only to ETPM's "downstream" contractors, i.e. contractors and subcontractors of ETPM, would fail should the provisions be given the foregoing literal translation. However, NGP has not established that this is the only or more commonly accepted translation of the phrase, nor has NGP established that "contracting operators" were intended to benefit from the provision.

If the translation of the term to "contractors" is utilized, it is not clear whether NGP is included in the classes of additional assureds. Indeed, there is little evidence before the Court concerning the status of NGP relative to the work being performed under the Construction Contract with the exception that NGP was, of course, owner of the work. The fact that NGP prepared the specifications for the project might indicate that NGP acted in the capacity of a general or prime contractor on the project. In any event, the Court's function is not to speculate on the intent of the parties absent evidence establishing that intent by a preponderance of the evidence. The evidence does not establish that parties such as NGP were intended to benefit from the additional assured provision of the CAMAT policy.[20] Likewise, for the same reasons stated above, the Court finds that NGP has not proven by a preponderance of the evidence that the blanket waiver of subrogation provision in Article V was intended to benefit parties such as NGP.

■ We turn now to NGP's contention that plaintiffs are barred from recovery by virtue of ETPM's failure to procure a waiver in fulfillment of its obligations under the Construction Contract.

The terms of the contract clearly required ETPM to procure and maintain a policy of marine hull insurance with a waiver of subrogation in favor of "owner." Plaintiffs contend that the term "owner" is ambiguous in that it could be construed to mean owners of vessels, and that the contract must, therefore, be construed against

---

**20.** Based upon our finding in this regard, we need not address plaintiffs' contention that coverage under the policy extended only to acts of the assured qua vessel owner. Plaintiffs cite *Lanasse v. Travelers Ins. Co.,* 450 F.2d 580 (5th Cir.1971), cert. denied, 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972), and its progeny for the proposition that coverage under the CAMAT policy extended only to the assured's risks as shipowner, and any waiver of subrogation of third parties must be similarly limited. We would note that the principle of the *Lanasse* case addresses the type of risk of the assured to which coverage applies and, as such, has no bearing on a waiver of subrogation against a party or a contractual agreement to procure such a waiver in a policy of insurance.

the party which drafted it, namely, NGP. We disagree.

In construing the Construction Contract, the contract must be viewed as a whole.[21] *Ogea v. Loffland Bros. Co.*, 622 F.2d 186 (5th Cir.1980). Part III of the contract, Paragraph .2 required ETPM [contractor] to provide certain insurance coverages acceptable to NGP [company]. Subparagraph .212 required ETPM to obtain owner's protective liability insurance in which "company" (NGP) shall be the named insured. Based upon the purpose of such insurance coverage, there is no question but that this reference to "owner" is the owner of the work, NGP. Subparagraph .213 of the contract addresses the requirement for comprehensive general liability insurance and requires a waiver of subrogation against the "owner, and the individual joint venturers thereof, their officers and employees and agents." Likewise, in subparagraph .215 which addresses airplane and helicopter insurance, and in subparagraph .2177 which addresses Longshoremen & Harbor Workers' Compensation insurance, the same language is used requiring a waiver of subrogation against "owner." This is also the language utilized in the provision for marine hull insurance, subparagraph .216, set forth above in the Court's findings of fact.

Reading the contract as a whole, the term "owner," although not specifically defined in the contract, can only mean the owner of the work, NGP. Plaintiffs' contention that "owner" refers to owners of vessels employed by ETPM in performing the contract ignores the fact that such a construction would render the other provisions in which that term is used meaningless with reference to waiver of subrogation against "owner." The contract by its unambiguous terms evidences the intent of the parties, specifically, the obligation of ETPM to procure a waiver of subrogation against NGP in the policy of hull insurance covering the performance of the contract.

Extrinsic evidence is inadmissible to vary the legal effect of the unambiguous provisions of the contract. *Talen's Landing, Inc. v. M/V Venture*, supra; *Zimeri v. Citizens & South. Intern. Bank of N.O.*, 664 F.2d 952 (1981) and cases cited therein.

Having found that the contract between NGP and ETPM required a waiver of subrogation against NGP in the policy of hull insurance to be procured by ETPM, the holding in *Liberty Mutual Insurance Company v. Gulf Oil Corporation*, 559 F.Supp. 777 (E.D.La.1983), affirmed, 725 F.2d 293, is dispositive of this case. "Basic contract law places a subrogee in the shoes of the subrogor; he cannot acquire by subrogation greater rights against the debtor than the subrogor possessed." 559 F.Supp. at 782. CAMAT, as subrogee, cannot enforce rights that ETPM, as subrogor, did not possess. Since the Construction Contract required ETPM to procure a policy of hull insurance with a waiver of subrogation against NGP, CAMAT cannot proceed against NGP where ETPM could not.

Plaintiffs also contend that if NGP was a contemplated beneficiary of the waiver provision set forth in subparagraph .2164 of the NGP contract, NGP's defense must fail since ETPM procured any necessary coverage through the Northwest comprehensive general liability policy. Plaintiffs argue that since there was no waiver of subrogation in favor of NGP in the hull policy, a "difference of conditions" has arisen and Northwest must respond for any contractual liability flowing through to ETPM as a result of its obligation under subparagraph .2164. We disagree.

Pursuant to the contract between ETPM and NGP, ETPM was clearly obligated to procure a waiver of subrogation against NGP *in the policy of hull insurance*, as well as in the policy of comprehensive general liability insurance. ETPM's failure to assure that such a waiver in the hull policy was effected is dispositive of this issue. In that regard, we need not address the effect

---

**21.** See, Appendix I which fully sets forth the insurance requirements of the Construction Contract.

of the coverage provided under the Northwest policy upon CAMAT's rights, if any, under that policy. Plaintiffs' contentions concerning the existence of a "difference-in-conditions" for which Northwest must respond are not properly asserted against NGP. The principles of subrogation foreclose the "circuitous legal route" asserted by plaintiffs. *Liberty Mutual Insurance Co. v. Gulf Oil Corp.,* supra, at 782 fn. 3.

■ Finally, plaintiffs contend that since NGP approved a certificate which did not mention the CAMAT hull policy, NGP is barred from interposing ETPM's failure to obtain a waiver of subrogation in that policy as a defense to their claims. In this regard, plaintiffs' reliance on the case of *Standard Oil Company of Texas v. Wampler,* 218 F.2d 768 (5th Cir.1955), is misplaced. In that case, an oil company's insurer attempted to recover from its drilling contractor the amount which it had paid to satisfy a judgment rendered against the oil company in a personal injury suit brought by an employee of the contractor. The Court found that even if the contract between the contractor and oil company could be construed as requiring the contractor to furnish insurance covering the oil company's negligence, the oil company had procured such insurance of its own. Thus, the proper measure of damages for the contractor's failure to procure such insurance would have been the premiums paid for the insurance procured by the oil company.

That holding is obviously inapposite to the case at bar, since ETPM, in fact, procured the requisite hull insurance under which the Tarpon claim was paid. The decision has no bearing on the issue of ETPM's failure to waive subrogation against NGP. ETPM apparently relies on the fact that in the *Wampler* case, the contractor had furnished a certificate of insurance to which the oil company made no objection. However, this fact was irrelevant to the Court's holding on the issues before it, and the Court did not have occasion to consider the merits of the defense of waiver or estoppel.

■ Construing plaintiffs' contention in this regard as one of waiver or estoppel, the Court finds that the evidence does not support an application of either of these theories. Waiver consists of the intentional relinquishment of a known right. *Southbend Contractors, Inc. v. Parish of Jefferson,* 408 So.2d 1158 (La.App. 4th Cir. 1981). The doctrine of equitable estoppel is applied where there is a representation upon which a party justifiably relies to his detriment. *Zimeri v. Citizens & Southern International Bank of New Orleans,* 664 F.2d 952 (5th Cir.1981). The mere acceptance by NGP of Certificates of Insurance does not give rise to the application of either of these principles.

■ NGP contends that it is entitled to an award of attorney's fees incurred in connection with its defense of this matter on the grounds that plaintiffs have acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *F.D. Rich Co., Inc. v. United States, for the use of Industrial Lumber Company, Inc.,* 417 U.S. 116, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). The general rule in federal courts is that attorneys' fees are not recoverable in the absence of statute or contract, and the Court finds that there is no basis for deviating from this principle in the instant case.

Accordingly, for the foregoing reasons, there should be judgment herein in favor of the defendant, dismissing plaintiffs' claim, at plaintiffs' cost. The Clerk of Court is directed to enter a judgment in accordance herewith.

## APPENDIX I

### 111 CONSTRUCTION BOND AND INSURANCE—OFFSHORE

For the better assurance of Company that Contractor will faithfully perform this Contract and for its better protection against claims, however groundless, asserted against it in any wise, because of Contractor's relationship with Company hereunder, Contractor shall procure and submit the necessary Bond/s and Insurance coverage as stipulated below, after being noti-

fied by Company that Contractor is the successful bidder.

.1 BOND/S TO BE FURNISHED BY CONTRACTOR:

.11 At Company option, Contractor shall procure and submit a Performance and a Labor and Material Payment Bond/s, for the estimated amount of total contract cost.

.111 Said bond/s shall provide that Contractor shall promptly and faithfully perform all the terms and conditions of the contract, and shall promptly make payment for all labor, material, supplies and equipment used or reasonably required for use in the performance of said contract.

.112 Said bond/s shall be issued by a surety acceptable to Company and shall be in favor of Company, its successors or assigns, and in favor of laborers, materialmen, suppliers and lessors.

.113 In the event Company exercises its option, Contractor shall submit such bond/s in the manner and within the time provided in Sub-Part 104.1 hereof at the time of notification to successful bidder. Contractor shall be reimbursed for the full cost of such bond/s at the price submitted by Contractor in the Proposal, Part 310.

.12 In the event the scope of the work is increased through an amendment, Contractor shall, if requested by Company, procure either a bond covering the total contract cost or a rider to Contractor's existing bond/s covering the increased contract costs.

.13 Any adjustment in the cost of procuring the aforementioned bond/s by Contractor shall be submitted to Company at the completion of the work.

.2 INSURANCE COVERAGE TO BE FURNISHED BY CONTRACTOR:

.21 Contractor shall procure within the time provided, and during the entire period of this Contract, maintain and continue in force, from reliable insurance companies acceptable to Company and by forms of policy approved by it, the following minimum coverages:

.211 Workmen's Compensation and Employer's Liability.

.2111 In Jurisdictions Having Workmen's Compensation Law Affording Complete Coverage: Statutory Workmen's Compensation and Employer's Liability coverage, as well as "all states endorsement", including Voluntary Compensation in the amount of $250,000.00 for accidental injury to one or more persons in any one accident and where the Compensation Law does not provide for Occupational Disease, then Employer's Liability Occupational Disease in limits of $250,000.00 each person and $1,000,000.00 policy aggregate.

.2112 In Jurisdictions Not Having Workmen's Compensation Law or Not Having Complete Coverage Under Such Law: Employer's Liability Coverage in limits of $250,000.00 each person and $1,000,000.00 each accident, and Employer's Liability for Occupational Disease in Limits of $250,000.00 each person, $1,000,000.00 each accident, and $1,000,000.00 policy aggregate.

.2113 Coverage to provide that a claim "in rem" shall be treated as a claim against the assured or "in personam".

.212 Owner's Protective Liability Insurance:

Under said coverage, Company shall be the named insured, protecting it from all liability for injuries to, or the death of any person, or for damage to, or loss of property arising from or alleged to arise from said work or the performance thereof by Contractor, in the amount of at least $250,000, for liability on account of personal injury or death of each person and not less than $500,000 for total liability resulting from each accident. Property damage insurance shall be in the amount of at least $250,000 for liability on

account of damage to or destruction of property resulting from each accident and not less than $500,000 aggregate.

.213 Comprehensive General Liability and Property Damage-Contractual Liability-Completed Operations: Comprehensive General Liability and Property Damage including Contractual Liability and including Completed Operations coverage, in Bodily Injury limits of $500,000.00 each person and $1,000,000.00 each occurrence; in Property Damage limits of $500,000.00 each occurrence and $500,000.00 operations, $500,000.00 aggregate protective, and $500,000.00 aggregate contractual. Such insurance shall include the following:

.2131 Contractors' Protective Liability, covering liability for work sublet.

.2132 Contractual Liability, insuring the indemnity agreements contained in this contract.

.2133 "In rem" endorsement, stating that an action "in rem" shall be treated as a claim against the insured "in personam".

.2134 Waiver of Subrogation against the owner, and the individual joint venturers thereof, their officers and employees and agents.

.2135 Coverage for damage due to collapse of or structural injury to any structure, or and to wires, conduits, pipelines, or any other property below the surface of the ground, both onshore and offshore.

.2136 Removal of the "watercraft" exclusion from the Liability Policy, including the contractual coverage. Alternatively, Protection & Indemnity Insurance may be provided as outlined in Paragraph .2162 below.

.2137 Territorial extension to include the entire Gulf of Mexico without mileage limitation.

.214 Comprehensive Automobile Liability and Property Damage: Bodily Injury limits of $250,000.00 each person and $500,000.00 each occurrence Property Damage limit of $250,000.00 each occurrence.

.215 Airplane and Helicopter Insurance: Contractor using owned aircraft or employing aircraft in connection with work performed under this Contract: Bodily Injury Liability excluding passengers, $250,000.00 each person $500,000.00 each occurrence; Property Damage Liability $1,000,000.00 each occurrence.

.2151 Waiver of Subrogation against the owner, the individual joint ventures thereof, and their officers and employees and agents.

.216 Water Craft Liability:

.2161 Contractor using owned vessels or vessel operated for Contractor or its subcontractor shall provide Hull Insurance in an amount equal to full value of each vessel or vessels. Insurance shall include full Collision Liability where said vessels are engaged in towing operations and shall further include full Tower's Liability.

.2162 Protection and Indemnity insurance to be provided in an amount equal to the full value of all vessels owned and/or operated by or for the Contractor.

.2163 Excess Protection and Indemnity Collision Liability Insurance in an amount up to $1,000,000.00 for vessels owned and $100,000.00 for vessels subcontracted.

.2164 Waiver of Subrogation against the owner, the individual joint ventures thereof, and their officers and employees and agents.

.217 In addition to the insurance heretofore required, Contractor shall procure the following coverage:

.2171 Coverage for Liability under the United States Longshoremen's and Harbor Workers Compensation Act with endorsement for Outer Continental Shelf Lands Act.

.2172 Coverage for employer's liability under Admiralty jurisdiction including Masters and Members of the Crews of Vessels (on a Voluntary Com-

pensation Basis) with limits of liability of not less than $500,000.00 for injury to or death of any one person and not less than $1,000,000.00 for injury to or death of more than one employee resulting from any one accident. Coverage shall also be extended to provide against liability of the employer for transportation, wages, maintenance and cure to any maritime employee.

.2173 Employers Liability, including Occupational Disease, subject to a limit of liability of not less than $500,-000.00 any one accident.

.2174 Territorial extension to include the entire Gulf of Mexico without mileage limitation.

.2175 "In rem" endorsement, stating that an action "in rem" shall be treated as a claim against the insured "in personam".

.2176 "Borrowed servant" endorsement, stating that a claim brought against the owner in Compensation as a "borrowed servant" by an employee of the Contractor will be treated as a claim against Contractor.

.2177 Waiver of Subrogation against the owner, the individual joint ventures thereof, and their officers and employees and agents.

.2178 Coverage to provide that medical payment be increased to $10,-000.00 per person over statutory limits provided.

.2179 Coverage to provide against liability under "Wrongful Death on the High Seas Act".

.22 Within the time provided in Part 104 hereof, and as often thereafter as any change may be made in any insurance carrier, Contractor shall deliver to Company, on Company's form, at its office in Chicago, Illinois, certificates showing minimum coverages as required by Sub-Part .2 hereof, each certificate providing that cancellation thereof shall not be effective unless thirty (30) days prior notice of such

cancellation shall be furnished Company by registered mail.

.3 As indicated in Part 119.1 of the Specifications, Contractor shall be responsible for any and all material or work during the period of construction and until final acceptance thereof ........... At Contractor's option, "All Risk" insurance covering the work to be performed under this contract, including material being furnished by Company, may be provided by Contractor at his sole expense. If such insurance is procured, Contractor shall furnish Company with a copy of such "All Risk" policy prior to the commencing of the work. The furnishing of such insurance by the Contractor shall not relieve Contractor of his responsibility for this and any other work that may exist under this contract.